**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| FAYE BLACK and JEANNINE TOLSON individually and on behalf of all others similarly situated, | Case No. 6:23-cv-01218-EFM-ADM |
| Plaintiffs, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| UNION PACIFIC RAILROAD COMPANY, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ....................................................................................................... iii

Index of Exhibits ............................................................................................................ vi

I.      Summary of the Brief .......................................................................................... 1

II.     Procedural Background ......................................................................................... 2

III.    Factual Background and Evidence Presented ...................................................... 2

   a.   History of 29th and Grove ................................................................................ 2

   b.   The Homes are Subject to Vapor Intrusion ...................................................... 4

   c.   Failure to Timely Inform Property Owners ...................................................... 6

   d.   Failure to Timely Delineate the Groundwater Plume ...................................... 8

   e.   Inadequate Investigation and Negligent Remediation Ensued ...................... 10

   f.   TCE Concentration Levels .............................................................................. 12

   g.   Expert Testimony ............................................................................................ 16

      i.    Richard Laton, Ph.D. ................................................................................ 16

      ii.   Frank Anastasi .......................................................................................... 18

      iii.  Mark Kram, Ph.D. .................................................................................... 20

      iv.   Thomas Hatton ......................................................................................... 22

      v.    Richard Zabel, Ph.D. ................................................................................ 24

IV.     Legal Standard .................................................................................................... 24

V.      Argument ............................................................................................................ 26

   a.   Plaintiff has Proposed an Objectively Defined Class .................................... 26

   b.   Rule 23(a) has been Satisfied ......................................................................... 28

      i.    Numerosity ................................................................................................ 28

      ii.   Commonality ............................................................................................. 28

      iii.    Typicality ................................................................................................. 29

      iv.    Adequacy ................................................................................................. 30

c.    Rule 23(b)(3) has been Satisfied ..................................................................... 32

    i.    Predominance ......................................................................................... 32

      1.    Common issues predominate over individual issues for each of Plaintiff's causes of action ........................................................................................................... 33

        Negligence ......................................................................................... 34

        Negligent Remediation ..................................................................... 35

        Continuing Nuisance ........................................................................ 36

        Continuing Trespass ......................................................................... 36

        Kansas Discharge Statute K.S.A. 65-6203 ..................................... 37

      2.    Property Mitigation Damages can be Determined Class-Wide ....................... 38

    ii.    Superiority ............................................................................................. 38

d.    Alternatively, a Rule 23(c)(4) Issue Class should be Certified .................... 39

e.    Class Definitions can be Modified and Subclasses Identified .................... 40

VI.    Conclusion .................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Cases**

*Adamson v. Bowen*, 855 F.2d 668 (10th Cir. 1988)........................................................ 29

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ............................ 25

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ...................................................... 31

*Behar v. Northrop Grumman Corp.*, 2024 WL 4004052 (C.D. Cal. July 1, 2024) ................................. *passim*

*Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498 (D. Kan. 2014) ................................ 28

*Bentley v. Honeywell Int'l*, 223 F.R.D. 471 (S.D. Ohio 2004)..................................... 31

*Black v. Occidental Petroleum Corp.*, 69 F.4th 1161 (10th Cir. 2023) ........................ 25

*Brown v. St. Gobain Performance Plastics*, 2023 WL 9023158 (D. N.H. Dec. 29, 2023) ................. 34, 36, 37

*City of Neodesha v. BP Corp.*, 334 P.3d 830 (Kan. Ct. App. 2014) ........................... 35, 37

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .......................................................... 32

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ................................. 27

*Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999) ........................................................ 40

*Eastman v. Coffeyville Res. Ref. & Mktg. LLC*, 295 Kan. 470 (2012) ........................ 37

*Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253 (D. Kan. 2010) .................... 24, 26, 28, 30

*Evans v. Brigham Young Univ.*, 2023 WL 3262012 (10th Cir. May 5, 2023) .............. 26

*Heaven v. Trust Company Bank*, 118 F.3d 735 (11th Cir. 1997)................................. 40

*In re Chiquita Brands Int'l Inc.*, 331 F.R.D. 675 (S.D. Fla. 2019)............................. 26

*In re Delta Airlines*, 2023 WL 2347074 (C.D. Cal. Feb. 8, 2023) ........................... 33, 37

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1873989 (D. Kan. Feb. 27, 2020)............ 30

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014)...................................... 33

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012)............................................. 33

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ........................................... 39

*Martin v. Behr Dayton Thermal. Prods.*, 896 F.3d 405, *cert. denied*, 139 S.Ct. 1319 (2019)
   (6th Cir. 2018) ...................................................................................... 26, 39, 40

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) .......................................................... 1

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) ........................................................ 34

*Menocal v. GEO Grp., Inc.*, 882 F.3d 905 (10th Cir. 2018) ........................................................38, 39

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ...................................... 33

*Mullins v. Direct Digit., LLC*, 795 F.3d 654 (7th Cir. 2015) ............................................................. 26

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259 (10th Cir. 2012) ........................................... 36

*Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779 (10th Cir. 2019) ..........................32, 38

*Ottawa N.R.R. v. City of Baldwin*, 2023 WL 7923152 (D. Kan. Nov. 16, 2023) .............................. 37

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ...................................................................... 33

*Raytheon Aircraft Co. v. United States*, 590 F.3d 1112 (10th Cir. 2009) ........................................... 4

*Rider v. OXY USA, Inc.*, 2025 WL 1707377 (D. Kan. June 18, 2025) ............................................... 26

*Rowe v. E. I. Dupont De Nemours*, 262 F.R.D. 451 (D.N.J. 2009) .................................................... 30

*Schaeffer v. Gregory Village Partners, L.P.*, 105 F. Supp. 3d 951 (N.D. Cal. 2015) ....................... 37

*Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182 (10th Cir. 2023) .................................... 25, 29, 32

*Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ................................................... 33

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) .................................................... 35

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................................32, 33

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ................................................................... 40

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013) ................ 38

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................................................... 28

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012) .................................................... 27

*Zuniga v. Bernalillo Cnty.*, 319 F.R.D. 640 (D.N.M. 2016) ............................................................. 28

**Statutes**

Kan. Stat. Ann. § 65-6203 .................................................................................................................. 31

Kan. Stat. Ann. § 65-3456a ................................................................................................................. 3

Kan. Stat. Ann. § 77-613 ................................................................................................................ 3

**Other Authorities**

Schuver, H.J., C. Lutes, J.Kurtz, C. Holton, and R.S. Truesdale, 2018. Chlorinated Vapor Intrusion
    Indicators, Tracers and Surrogates: Supplemental Measurements for Minimizing the Number of
    Chemical Indoor Air Samples – Part 1: Vapor Intrusion Driving Forces and Related
    Environmental Factors; Remediation, v.28, ......................................................................... 21

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................................... 25

Fed. R. Civ. P. 23(a)(1) ............................................................................................................... 28

Fed R. Civ. P. 23(a)(3) ................................................................................................................ 29

Fed. R. Civ. P. 23(a)(4) ............................................................................................................... 30

Fed. R. Civ. P. 23(b)(3) .........................................................................................................25, 38

**Treatises**

2 W. Rubenstein, *Newberg on Class Actions* § 4:49 (5th ed. 2012) ........................................32, 39

## INDEX OF EXHIBITS

| Exhibit Number | Description |
|---|---|
| Ex. 1 | Consent Order - October 7, 2002 |
| Ex. 2 | Community Relations Plan – May 2003 |
| Ex. 3 | B. Kick Email – Preliminary Response to Comments |
| Ex. 4 | Final Corrective Action Decision – February 2023 |
| Ex. 5 | First Amendment to Consent Order – April 27, 2023 |
| Ex. 6 | Expert Report of Dr. Richard Laton |
| Ex. 7 | EPA Rule: *Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)* |
| Ex. 8 | Expert Report of Dr. Mark Kram |
| Ex. 9 | Deposition Transcript of Adam Love (Select Pages)[1] |
| Ex. 10 | Email to Rewey Re Wichita Public Meeting |
| Ex. 11 | KDHE 29th and Grove Health Study – April 2023 |
| Ex. 12 | KMUW News Article (November 5, 2022) |
| Ex. 13 | KSNW News Article (May 22, 2023) |
| Ex. 14 | Wichita Beacon News Article (January 26, 2023) |
| Ex. 15 | UP Email Re 29th and Grove Health Study |
| Ex. 16 | Deposition Transcript of Bob Kick (Select Pages) |
| Ex. 17 | Remedial Investigation Figure 1-3 (Full Size) |
| Ex. 18 | Revised Feasibility Study Figure 1-1 (Full Size) |
| Ex. 19 | Revised Feasibility Study (August 31, 2007) |
| Ex. 20 | 2018 Arcadis Map of Groundwater Plume |
| Ex. 21 | 2024 Arcadis Map of Groundwater Plume |
| Ex. 22 | Deposition Transcript of Kristen Stevens (Select Pages) |
| Ex. 23 | Deposition Transcript of Rebecca Rewey (Select Pages) |
| Ex. 24 | Foth Revised Phase 2 Air Pathway Analysis |
| Ex. 25 | Email from B. Kick Re Soil Flux Testing |
| Ex. 26 | Arcadis Vapor Intrusion Sampling Work Plan (January 20, 2012) |
| Ex. 27 | Arcadis Vapor Intrusion Re-Evaluation Work Plan (September 15, 2023) |
| Ex. 28 | Email from B. Glasrud – TCE VISLs - A variety |
| Ex. 29 | Email and Region 7 Memo on Updated TCE Screening Levels (October 10, 2024) |
| Ex. 30 | R. Rewey Text Messages to J. Shonfelt (Select Messages) |
| Ex. 31 | R. Rewey Text Screenshot of VISLs |
| Ex. 32 | UP Employee Email Discussing Health Study |
| Ex. 33 | Class Area – Figure 24 of Dr. Laton Report |
| Ex. 34 | Expert Report of Mr. Frank Anastasi |
| Ex. 35 | Deposition Transcript of Mr. Frank Anastasi |
| Ex. 36 | Deposition Transcript of Ms. Brooke Glasrud |
| Ex. 37 | EPA Guidance: |

[1] Due to the enormity of deposition pages in this matter (likely in excess of 5,000) Plaintiff is providing only select pages of the depositions reflecting those actually cited herein. Plaintiff will supplement with the full transcript at the Court's request.

| | OSWER<br>Technical Guide for Assessing and Mitigating the Vapor Intrusion<br>Pathway from Subsurface Vapor Sources to Indoor Air |
|---|---|
| Ex. 38 | Expert Report of Mr. Thomas Hatton |
| Ex. 39 | Expert Report of Dr. Jeffrey Zabel |
| Ex. 40 | Deposition Transcript of Jeffrey Zabel (Select Pages) |
| Ex. 41 | Deposition Transcript of Ms. Faye Black (Select Pages) |

## I.    <u>SUMMARY OF THE BRIEF</u>

This is case brought by Plaintiff Faye Black and the proposed class for property damages due to the presence of carcinogenic chemicals on their property which necessitates mitigation.  Defendant Union Pacific (UP) asserts that the presence of these carcinogens is acceptable.  Plaintiff and the putative class do not agree.  In the groundwater is a plume of chemicals, comprised primarily of trichloroethene (TCE), a known human carcinogen, at concentrations that increase the risk of cancer beneath the homes of Ms. Black and the class members.  Ms. Black and the class do not want these carcinogens on their properties *in any concentration*. Yet, the TCE remains on their over two decades after UP entered into a Consent Order with the Kansas Department of the Health and the Environment (KDHE).

UP does not dispute that TCE is in the groundwater beneath the homes of the class members; it merely suggests it is not worthy of the action necessary to protect Plaintiff and the Class now.  Ms. Black and the Class take exception and seek damages for the necessary cost of mitigation systems to safeguard themselves from UP's contamination.

Environmental claims specifically related to the questions presented in this case have been certified pursuant to Rule 23(b)(3).  As clearly stated by Judge Posner in another TCE groundwater contamination class action, it "makes good sense" to certify a class in this instance.  There are numerous common issues, many of those critical to resolution of the issues in this case and resolving these issues in "one fell swoop" is appropriate.  *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (Posner, J.).  The certification issues presented here compare favorably to those addressed by the Seventh Circuit in *Mejdrech*. As with *Mejdrech*, questions such as: (a) whether Defendant discharged contaminants onto Plaintiff's and the class members' properties; (b) whether Defendant failed to properly contain or remediate those contaminants; and (c) whether the contaminants that

threaten properties within the class area are not only common to all class members' claims but predominate the issues to be addressed in the litigation. *Id.* at 911–12.

More recently, a United States District Court in the Central District of California followed suit in a case involving nearly identical claims and facts, including the same contaminant in groundwater beneath residential properties. "Plaintiffs' claims are well suited for class treatment; they present several common issues of law and fact that are most efficiently resolved on a classwide basis." *Behar v. Northrop Grumman Corp.*, 2024 WL 4004052, at *1 (C.D. Cal. July 1, 2024).

Here, similar questions predominate this litigation: (a) whether Defendant discharged contaminants onto Plaintiff's and the class members' properties; (b) whether Defendant failed to properly contain or remediate those contaminants; and (c) whether the presence of TCE contamination within the groundwater plume at concentrations of 1.2 $\mu$g/L necessitates mitigation of class area homes.

Like those before it, this matter is apt for class treatment for the following reasons.

## II.    PROCEDURAL BACKGROUND

On October 10, 2023, Plaintiff filed this putative environmental class action seeking compensation for damages to property, including mitigation expenses, diminished value of property and nuisance damages. Plaintiff retains claims for (1) Negligent Remediation, (2) Continuing Nuisance, (3) Continuing Trespass, and (4) Violation of the Kansas Discharge Statute, KSA § 65-6203.

The parties have engaged in voluminous and extensive discovery and now Plaintiff Faye Black now moves for class certification pursuant to Fed. R. Civ. P. 23(b)(3).

## III.    FACTUAL BACKGROUND AND EVIDENCE PRESENTED

### a.  History of 29th and Grove

UP owns and operates an industrial railroad site known as the "29th and Grove Environmental Site" in Wichita, Kansas (the "Site") between I-135 and Grove Street. Ex. 1, Consent Order. In 1994,

the City of Wichita discovered TCE ground water contamination in the area near 21st Street North and Grove Streets. *Id.* ¶ 9. Based on investigations from 1995 to 2000, the Kansas Department of Health and the Environment ("KDHE") confirmed that UP's Site was the source of the TCE contamination. *Id.* ¶¶ 10-12. In 1998, KDHE determined that "the TCE plume extends at least one mile south of the release area to Stadium Street" with a concentration of TCE there "as high as 866 ug/L." Ex. 2, Community Relations Plan at 3-4. While KDHE did not know the exact cause of the release, it confirmed UP was the source. *Id.* at 4.

In 2002, UP entered a consent order with KDHE to investigate the contamination and potential remediation options. Ex. 1. The Consent Order is a negotiated agreement between UP and KDHE, the state regulator which works in the confines of that regulatory framework. *Id.* ¶¶ 1-4. That framework does not provide ultimate authority for KDHE to impose its findings upon UP (or any other polluter).

> Any person adversely affected by any order or decision of the secretary may, within 15 days of service of the order or decision, request in writing a hearing. Hearings under this section shall be conducted in accordance with the provisions of the Kansas administrative procedure act.

Kan. Stat. Ann. § 65-3456a. KDHE and UP, thereby, avoided litigation by entering into this Consent Order. But if UP and KDHE disagree as to what type of action is required under the Consent Order, KDHE cannot simply compel action. Instead, a "Dispute Resolution" process was agreed to whereby UP can notify KDHE of its disagreement with the request and can then appeal the decision pursuant to the Administrative Procedure Act, which includes litigation in a court of law as permitted. *Id.* ¶¶ 61-64. *See* Kan. Stat. Ann. § 77-613.

KDHE did not dictate the meaning of the Consent Order, or its requirements. Instead, UP and KDHE engaged in conversations about what was or was not required, with KDHE typically accepting UP's reasoning. Ex. 3 ("The meeting was very positive and we came to a favorable

agreement on most issues."  We found Jean [KDHE employee] to be friendly, level-headed and wiling to list and support technical reasoning.").

The Consent Order likewise confirms that it is not binding on any other party, including Plaintiff and the proposed class, nor does it release or control any claims any other party may have:

> 48. Nothing in this Consent Order shall constitute or be construed as a release for any claim, cause of action or demand in law or equity against any person, firm, partnership, or corporation not a signatory to this Consent Order for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous constituents, hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the facility.

Ex. 1, p. 15 ¶ 48.  The Consent Order concluded that the Site and adjacent areas were contaminated in the soils and groundwater, and the contamination "is or may be threatening to become a hazard to persons, public health, or safety." *Id.* ¶¶ 13-14. Based on the mere presence of contamination, UP agreed to investigate and remediate the migration of TCE.

In 2003, KDHE and UP learned that UP's TCE plume extended 2.7 miles south of the Site to Murdock Ave. Ex. 4, p. 6. In 2006, UP completed a Remedial Investigation that KDHE approved for the Site. Ex. 5, ¶ 3. In 2010, UP completed a Feasibility Study that KDHE approved. *Id.* ¶ 4. From 2004 to 2018, UP implemented interim measures to remediate contamination from the source Site. *Id.* ¶ 6. In 2023, KDHE issued a Final Corrective Action Decision. Ex. 5. The CAD reiterated that "UP is responsible for the TCE contamination." *Id.* at 26.

### b.  The Homes are Subject to Vapor Intrusion

The primary contaminant of concern is TCE.  "TCE is a colorless solvent used to remove oil and grease from metal parts." *Raytheon Aircraft Co. v. United States*, 590 F.3d 1112, 1115 (10th Cir. 2009). "The largest sources of TCE in groundwater are releases from chemical waste sites, improper disposal practices, and leaking storage tanks and pipelines." Ex. 6, p. 25. TCE is moderately soluble in water and soil. TCE is denser than water, and free-phase TCE will sink to the bottom of an aquifer as a DNAPL (dense, non-aqueous phase liquid) (denser than and immiscible in water)." *Id.*

On December 17, 2024, the EPA issued a final rule on TCE that all uses of TCE present an unreasonable risk of injury to health and that there are no safe exposures. Ex. 7; *see also* 89 Fed. Reg. 102571 (Dec. 17, 2024).

Volatile contaminants like TCE in groundwater directly impact structures above that groundwater, like the Class Area homes. TCE volatilizes—enters the vapor phase—and migrates through soil toward the surface. Ex. 8 p. 33. This is known as "Vapor Intrusion." Every home in the potential class area (PCA) is located on contaminated groundwater which unacceptably increases the residents' risk of developing cancer. The chemicals contaminate the soil, migrating up through the soil which is measured as "soil gas" or "soil vapor." *Id.* When testing for TCE gas in the soil, there is significant spatial and temporal variability—variation in levels from location to location and from day to day. Ex. 8, p. 37.

From the soil, TCE migrates through the foundation and/or crawlspace and accumulates in the indoor air in residences, resulting in toxic exposures to residents. *See* Image to the Right; *see also* Ex. 8, p. 99.



Whether these chemicals are detected during indoor air testing depends on numerous variables that effect the flow of vapors into the home (vapor intrusion "VI" "on" conditions) and whether the air sample taken is representative of indoor air levels. Ex. 8. pp. 40-43. UP's consultants and experts agree. Ex. 9 p. 227:6-22. Conditions like having the windows open can affect both of these by reducing

or eliminating negative pressure gradients into the home turning VI "off" and by diluting any contaminants present in the indoor air by increased ventilation. Ex. 8 p. 47.

Some of these variables vary generally by season (*e.g.*, indoor-outdoor temperature differences) and, therefore, sampling during multiple seasons is one means of attempting to capture some of the variation in indoor air conditions. But several rounds of sampling in each home are required to adequately characterize the impact of TCE contamination on the indoor air by identifying what the EPA deems the "reasonable maximum exposure" or RME. *Id.*, p. 11 ("a thorough evaluation of the range of conditions as well as the reasonable maximum exposure (RME) should inform all VI risk-based decisions."). The fewer rounds of sampling in each home the greater the likelihood of false-negative findings (finding low or no contaminant risk when significant risks exist) and research published by EPA experts indicates that as many as 58-rounds of sampling are required within each home to assess contaminant risks. *Id.*, p. 27.

But despite the known limitations of randomly timed indoor air testing, UP relies on a limited number of tests (typically just one round is used to "clear" a home) to determine whether action is necessary to protect the class members. Even multiple negative indoor air tests do not establish that the TCE in groundwater is not a threat to homes. Thus, that threat is more reliably confirmed by more stable groundwater samples. Further, these single or paired indoor air tests are not sufficient even to rule out exposure. Nevertheless, UP is using unreliable single indoor air testing to deny protection to class members residing on groundwater contaminated by Defendant.

### c.  Failure to Timely Inform Property Owners

Despite entering into a Consent Order in 2002, KDHE held its first public meeting and informed the community in northeast Wichita about the TCE contamination and related public health risks, in September **2022**. Ex. 4, p. 10. News reporting from the "crowded" public meetings

documented the community's anger and disappointment about being kept in the dark.[2] The seriousness of the issue has led to reporting of physical altercations among local politicians. UP's internal emails noted "lots of emotion during the Q&A period with the bulk of the concern focused on why KDHE took so long to inform the community." Ex. 10.

In April 2023, KDHE released a "29th and Grove, Wichita Health Study" to assess if there were statistical increases in illnesses associated with the 29th and Grove Site:

> The 29th and Grove site is located along the northern part of a Union Pacific Railroad rail yard south of the K-96 Highway, between Highway I-135 and Grove Street, in Wichita, Sedgwick County, Kansas.
>
> ***
>
> Study Findings:
>
> - The rate of **liver cancer[1] was higher** in the area of interest than in Sedgwick County or the state of Kansas.
> - In particular, the rate of **liver cancer[1] among non-Hispanic Black persons** in this area was more than twice the rate compared to the same population in the state of Kansas.
> - Rates of low birthweight among infants in the area of interest were **higher than in the state of Kansas, though those rates decreased** from 2000 to 2021.

Ex. 11, p. 4 (emphasis in original). The KDHE Health Study explained:

> Based on the scientific literature, certain cancers may be associated with exposure to these chemicals in humans, including kidney and renal pelvis, liver and biliary tree, urinary bladder (including in situ), myeloma, lymphomas (Hodgkin's and non-Hodgkin's combined), and nonHodgkin's lymphoma separately. We limited our analysis to these cancers.
>
> ***
>
> The rate of liver and biliary tree cancer was significantly higher for the area of interest (15.7 cases per 100,000 population) compared to Sedgwick County (8.0 cases per 100,000 population), Region 5 (7.5 cases per 100,000 population) and to Kansas (6.4

---

[2] Ex. 12, "Somebody should be held accountable:" Community angered at contamination in northeast Wichita, KMUW, Ceclia Hack, Nov. 5, 2022; Ex. 13, "I'm just so angry': Wichitans feel state neglected to warn them of danger, The Beacon, Celia Clark and Trace Salzbrenner, Jan. 16, 2023; Ex. 14, "Community Demands answers at 29th and Grove groundwater contamination meeting," KSN-TV.com, Hanna Adamson, et al., May 22, 2023.

cases per 100,000 population) as shown by the confidence intervals that do not overlap.

Ex. 11, pp. 7, 8 (footnotes in original not included).  In May 2023, UP internally discussed the study results, noting "[o]ur talking points and media statement are being worked on now . . ." Ex. 15.[3]

### d.  Failure to Timely Delineate the Groundwater Plume

What was supposed to be an initial step that was taken by UP and its consultants was to delineate the extent of the groundwater contamination, *i.e.* to define the geographic boundaries of its groundwater pollution from the 29th and Grove Site.



In the Remedial Investigation, Forester had not fully delineated the plume but identified the northern portion for it and the need to continue to investigate.  Figure 1-3 to the right shows the known extent of the contamination as of May 23, 2003.  *See also* Ex. 16 pp. 33:21-34:5; Ex. 17 (full page image).



However, as late as August 2007, a Revised Feasibility Study still showed only a generally outlined groundwater plume that UP was referring to as a "29th and Grove Study Area." Image depicted to the right.  *See also* Ex. 18 (full page image).  Ex. 19 p. 83, Fig. 1-1 to the right.

---

[3] One day prior to the filing of this brief, the Magistrate Judge found that Union Pacific improperly withheld at least 160 documents in this litigation by claiming privilege over routine public messaging and reputation management materials. Doc. 183. Union Pacific's communications director explicitly instructed colleagues to copy attorneys on emails to "keep it under privilege," despite no legal advice being sought or provided. *Id.* at 8. This discovery misconduct exemplifies Union Pacific's pattern of concealment.

The groundwater plume was not fully delineated until 2018 by Arcadis, a subsequent consultant hired by UP:



*See* Ex. 20. (full page image).  Here, the yellow line represents Arcadis' "rough" delineation of the groundwater plume at 5 μg/L.  *Infra.* (testimony of Adam Love describing the delineation as "rough").  The orange line represents Arcadis' **100 μg/L** plume, *i.e.* twenty times the concentration of carcinogens in the groundwater and is a significant portion of the 5 μg/L plume.  More recently, UP has delineated the groundwater plume as the dotted blue line below:



*See also* Ex. 21 (full sized image); Ex. 22 p. 45:21-25 (agreeing the dotted blue line is an accurate representation of groundwater contamination at 5 µg/L); Ex. 23, pp. 171:17-172:3 (agreeing that UP delineated the groundwater plume to 5 µg/L).

Defense expert Adam Love has testified that "Arcadis didn't delineate what the potential risk for vapor intrusion was," it was done "to roughly delineate the extent of 5 micrograms per liter of groundwater impacts" of TCE.  Ex. 9 p. 87:7-88:25. But, he acknowledged it was never done to the type of resolution that Plaintiff's expert delineated the plume.  *Id.*

From 2002 until 2018, minimal progress was made towards completing delineation of the groundwater contamination to a reasonable degree of certainty.  During these decades, instead of delineating the plume, UP was trying to convince KDHE that people were not being exposed to the carcinogens on their properties in the indoor air through unreliable testing as explained below.

### e.  Inadequate Investigation and Negligent Remediation Ensued

UP's "investigation" has been a process of delay and deny for decades, beginning with UP's initial efforts carried about by its retained consultant The Forester Group a/k/a Foth, and continuing to this day with Arcadis.  In addition to taking 16-years to delineate the groundwater plume, in 23 years, UP has performed indoor air testing at a total of 39 homes (out of more than 2,700) above the groundwater plume. As part of its delay, UP repeatedly pushed back on KDHE requests to test indoor air in homes. Despite a number of homes with carcinogenic detections inside, it has offered mitigation to only a single home.

As part of its retention, Forester engaged in an Air Pathway Analysis (APA).  The first phase of the APA was to perform an unreliable test known as "soil flux testing" on public right of ways in September 2003.  Ex. 24 p. 1-1.  KDHE had already indicated it would not accept soil flux testing for this purpose, but UP persisted in performing it before testing indoor air because "[w]ithout this work, UP cannot explain or defend that indoor air detections do not originate from the groundwater."  Ex.

25. Concerned that KDHE would perform indoor air testing on its own, UP decided to test for indoor air concentration. Ex. 22 p. 84:10-86:11.

Phase 2 of the APA was then conducted in March of 2004. Ex. 24, p. 1-2. The report of Phase 2 was not submitted until June 16, 2006, more than 3.5 years after the Consent Order was entered. *Id.*; *see also* Ex. 1. UP tested a total of **five** of the nearly 2,700 homes on the contaminated groundwater plume, plus three homes outside the known groundwater plume that were to serve as "control" homes. *Id.* p. 2-1, 2-2. At this time, results were compared to EPA Region 9 Screening levels to determine if there was a complete pathway for contaminants to enter the homes. This limit, chosen by UP for TCE, was 0.17 $\mu g/m^3$. *Id.* pp. 3-2—3-10. Exceedances of this limit were found at each of the homes. However, UP blamed unspecified "other sources" for these exceedances despite never being able to identify another source. Ex. 9 pp. 119:13-120:12; 130:20-131:2.

Despite these findings and KDHE's response to not use the soil flux testing to predict indoor air exceedances, UP did just that. Ex. 22 p. 118:22-122:17. Even more egregious, based on this limited testing in 2006, UP suggested that they could extrapolate to all homes over the plume that no exposures were happening and testing should cease. *Id.*

At the same time, Forester was "remediating" the plume with an on-site system. However, insufficient progress was being made in reducing concentrations. With remediation of the plume not meeting expectations, UP released Forrester/Foth as its consultant and retained Arcadis in 2011.

Arcadis was retained and developed its own Vapor Intrusion Work Plan. In 2012, they increased what they deemed to be an acceptable level of indoor air contamination from 0.17 to 2.09 (a jump of over 10-times) and used that new concentration as a "screening level" to rule out further action if the concentration was less than 2.09. Ex. 26 pp. 4-5. However, a single indoor air test is not reliable for the purpose of ruling out exposure. Further, the indoor air testing does not indicate that

the groundwater is not contaminated nor that the TCE at the property does not have a complete pathway into the homes.

In 2013, seven homes had indoor air tested.

In 2023, working under the Consent Order, Arcadis developed for UP a Vapor Intrusion Re-Evaluation Work Plan to essentially test additional homes. Ex. 27. This plan also created a Decision Matrix whereby even with exceedances of these elevated air concentrations both in the home and beneath it, UP was still not committing to provide mitigation to the homeowner. *Id.* p. 17. Without exceedances in both, UP was offering no more than the potential for re-sampling. *Id.*

As of July 2025, UP and Arcadis have finally obtained approval for a new remediation system, which still has not been built. When the system is "up and fully built and up and running" it will take at least ten-years to remediate the plume. Ex. 22 p. 194:13-25. However, the remediation goal is to remediate the groundwater to 5 μg/L, which still presents an unacceptable risk of cancer due to the vapor intrusion pathway. *Id.* p. 195:3-16.

### f.   TCE Concentration Levels

One unacceptable danger that persists is the level of TCE groundwater concentration that UP has unilaterally determined is acceptable to the people living above the toxic plume. Additionally, UP never discloses the existence of more protective levels of TCE concentration or that the concentration at which they are taking action are above levels used by other regulatory authorities, including EPA Region 7, thereby leaving people at significant and unacceptable risk of cancer and other diseases including birth defects.

As explained above, in performing its APA, Foth used EPA Region 9 levels of 0.17 μg/m³. *Supra.* Anything above that air concentration was an exceedance. After retaining Arcadis, UP began using a different "screening level" of 2.09 μg/m³ and ruled out any further action, even for identified TCE in the home, below this concentration. There were many different concentrations that UP could

have chosen to rule in or out the need for mitigation; but they chose **the least protective** standard that KDHE would accept.

Arcadis employee, Brooke Glasrud, put her finger on this choice when she emailed her supervisor about choosing the appropriate concentration. In her email, "TCE VISLs – A variety" she laid out not only how different concentrations can serve as thresholds for action, but also how the levels are "health-based levels" because they correspond to EPA calculated levels of risk. Ex. 28. She noted that "1E-06" (indicating a cancer risk of 1 x 10$^{-6}$) corresponds to 0.2 $\mu g/m^3$ in the indoor air. *Id.* As that indoor air concentration increases, greater risk ensues as demonstrated by her column that 2 $\mu g/m3$ corresponds to "1E-04" (a cancer risk of 1 x 10$^{-4}$). *Id.* She also notes that EPA Region 7, in which Kansas is located, identifies 0.63 $\mu g/L$ as evidence of groundwater contamination. *Id.*

In fact, on June 18, 2024, EPA Region 7, which oversees Kansas, advised KDHE that UP should be delineating the groundwater plume to 0.62 $\mu g/L$ and then test the homes above that plume for vapor intrusion testing. Ex. 29. Senior Manager Rebecca Rewey, UP's primary employee overseeing the PCA and remediation, gave the letter to Arcadis and asked them to evaluate the EPA recommendation but could not recall why the EPA Region 7 standards were not followed. Ex. 23 pp. 314:10-316:25.

Additionally, UP's toxicologist consultant, Dr. Kelly Tuttle, advised Ms. Rewey that UP should be using a groundwater delineation of 1.2 $\mu g/L$ for a TCE target indoor air concentration of 0.478. *Id.* at 322:5-324:12. In text messages, Ms. Rewey asked her Arcadis consultant, John Shonfelt, why they were not using the lower indoor air level of 0.478 $\mu g/L$ for TCE instead of the non-cancer level of 2.09 based on a question from her supervisor, UP's General Director-Environmental Management Matt Graham. *Id.* pp. 345:22- 347:16; *see also* Ex. 30. Rewey even sent a screenshot from UP's toxicologist showing an indoor air concentration of 0.478 should be used. Ex. 31.

Ms. Rewey also testified that UP's top priority is safeguarding the community. Ex. 23 pp. 41:10-12. However, Ms. Rewey conceded that nothing prevented UP from using more protective concentrations as action levels and knew other states required levels more protective of health; but UP opted for the less stringent levels that KDHE would let them get away with. *Id.* at 63:14-19. In answering why UP did not voluntary adopt a more protective testing standard for the toxic spill they created, Ms. Rewey quipped, "Sure. We could" and "We could do that, but we don't." *Id.* at 110:20-24, 111:23-112:5. This, despite the fact that a third of the homes tested for vapor intrusion (with this insufficient data set) ***exceeded*** the Region 7 cancer risk level. Ex. 9 pp. 253:16-254:4.

Despite Ms. Rewey shrugging off UP doing more than the bare minimum, her "talking points" for a public meeting claimed that UP "is committed to protecting the environment and the communities where we operate. . . . We understand the importance of this project and will see the cleanup through to the end ***because it's the right thing to do***." Ex. 32.

Defense expert Adam Love acknowledges that these concentration levels can be chosen based upon what level of impact on human health the responsible party chooses.

> Q.    Okay. Sir, you define an acceptable risk and that sets your screening level; right?
>
> **A.    The screening levels are about excess risk above background, yes.**
>
> Q.    Okay. And so, they can be set at 1 in 10 to the minus 6th or 1 in 10 to the minus 5th, or 1 in 10 to the minus 4th; right?
>
> **A.    Those are all potential levels that it [sic] can be set, yes.**

Ex. 9 p. 34:7-15. He also confirmed that, outside of this case, he has used the same risk-based indoor air concentrations that Plaintiff's expert relies upon now:

> Q.    But the first step in the human health risk assessment would be to gather indoor air data and compare that to screen limits?
>
> **A.    Yes.**

14

Q.    And that's what you did for your health risk assessments in -- with respect to solvent exposure?

**A.    Yes.**

Q.    The EPA's screen limit for cancer effects is also 0.48; is that right?

MR. MAYO: Object to form.

**THE WITNESS: Yes.**

*Id.* pp. 24:15-25:1; *see also id.* pp. 22:11-24:4 (acknowledging use of 0.48 $\mu g/m^3$ for assessing cancer risk).

TCE in the groundwater at a concentration of 1.2 $\mu g/L$ or greater has been determined to present an unacceptable risk to the homes above it due to the vapor intrusion pathway. As acknowledged by Dr. Love above, *id.*, Plaintiff's expert Dr. Kram explains that a 1.2 $\mu g/L$ plume corresponds to 0.48 $\mu g/m^3$ of TCE, consistent with the EPA cancer risk level.

> [G]iven that EPA's indoor air risk screening TCE concentration is 0.48 $\mu g/m3$, the soil vapor risk screening level should be 16 $\mu g/m3$ and **the groundwater risk screening level should be 1.2 $\mu g/L$.** At present, the Defendant is implementing an indoor screening level of 2.09 $\mu g/m3$ (an indoor action level), when they should be adhering to the USEPA's indoor air screening level of 0.48 $\mu g/m3$.

Ex. 8. p. 14 (emphasis added). This EPA groundwater screening level, like any other, corresponds to an unacceptable risk and poses a danger to the class members necessitating mitigation.

It is imperative, however, when considering the "appropriate" screening level, to note that Plaintiff and the class members' tort and statutory claims are not bound to any number or any regulatory screening limit or action level. Plaintiff and the class have state law claims that do not require them to accept ***any level of risk***, or ***any carcinogenic contamination*** on their property from their corporate neighbor. In a medical malpractice action, a plaintiff need not show that the State took action on a physician's license to demonstrate negligence; nor do Plaintiff and the class need to show KDHE took action against UP for violating the Consent Order. The concentrations are not

dispositive of any of Plaintiff's claims made.  They are useful in understanding the danger created by the presence of the contamination across the Class Area, which the parties agree exists in the groundwater.

### g.  Expert Testimony

Plaintiff provided expert testimony from five experts.  Three hydrogeologists with slightly distinct, but complimentary expertise, opined as to the location of the groundwater contamination and the reliability of vapor intrusion testing.  Plaintiff also provided an expert in vapor intrusion mitigation who opined on the cost of installing mitigation systems in the class members' homes.  And an economist who opined that the current value of homes can be estimated class-wide.

### i.  Richard Laton, Ph.D.

Dr. Laton is an expert in "hydrology, hydrogeology, environmental contamination, and site investigations." Ex. 6 p. 7.  Dr. Laton was asked to review the geology of the Site and the surrounding residential area and opine on the present placement of TCE contamination from 29th and Grove.  His most pertinent opinions are:

- The source area is known as the 29th Street and Grove Site and is located within the northeastern portion of the Union Pacific Railroad (UPRR) rail yard.

- A TCE contaminant plume has been found to be migrating from the Site south into both residential and commercial areas.

- The range of TCE in all groundwater samples is from non-detect (ND) to 440,000 µg/L.

- There are 2,319 and 1,580 residential parcels within the 1.2 µg/L and 5.0 µg/L isoconcentrations, respectively.

*Id.* pp. 10-11.  With consideration to the topography, geology, hydrogeology, and multiple explained properties of the aquifer, Dr. Laton reviewed the groundwater sampling data and mapped a plume of TCE contamination.  *Id.* pp. 12-16.

Dr. Laton further relied on calculations by Dr. Mark Kram who determined that a 1.2 µg/L groundwater concentration attenuates to an indoor air 0.48 µg/m³ indoor air concentration. *Id.* pp. 30-31. Based on this, Dr. Laton mapped a 1.2 µg/L groundwater plume. *Id.* p. 31 ("the 1.2 µg/L TCE concentration in groundwater is the area of concern because of its potential for vapor intrusion effects on occupants of properties that lie over the UPRR TCE plume."). Dr. Laton mapped this 1.2 µg/L concentration as depicted below:



*Id.* p. 70, Figure 24; attached as Ex. 33. Using City of Wichita data, Dr. Laton calculated that 739 homes are above a plume of groundwater contamination between 1.2 µg/L and 5 µg/L concentration TCE, and 1580 homes are on a plume greater than 5 µg/L concentration.

Notably, Dr. Laton's 1.2 µg/L TCE plume compares favorably to the 5 µg/L plume that Arcadis drew.

 

*Compare* Ex 20 and Ex. 33. And most notably, so strictly did Dr. Laton adhere to the data (that UP collected ) that he found one Plaintiff (Jeanine Tolson) to be just outside the 1.2 µg/L plume.[4] Figure 24 identifies to that granular level of detail which homes are in the class area and which are not.

### ii. Frank Anastasi

Mr. Anastasi is a hydrogeologist with more than 40 years of experience working on complex projects involving the study and remediation of soil, ground water, and surface water/sediment contamination at industrial facilities and hazardous-waste sites; human-health and environmental risk assessments; and environmental compliance programs. Ex. 34. He offers opinions on the location of TCE contamination from the Site and on UP's negligent remediation since 2003.

First, Mr. Anastasi reviewed the contouring of the plume by Dr. Laton and offers that "In my opinion, it is more likely than not, accounting for the dynamics of the plume, that TCE contaminated ground water is present beneath the entire area encompassed by EF's [Dr. Laton's] 1.2 ug/L TCE contour (EF 2025)."

Mr. Anastasi explained that fluctuations in the groundwater sampling data are to be expected because of the hydrogeology in the class area. TCE is present in an upper silty-clay area from which groundwater sampling is not drawn. But as groundwater flows, it "recharges" the aquifer beneath it:

> Residual TCE mass held in storage in silty and clayey strata is diffusing into ground water and would be expected to cause continued fluctuations in dissolved TCE levels and locations of occurrence over time. In 2010, Arcadis explained the complex nature of this phenomenon at the site to UP: "TCE observed in the shallow monitoring wells in the southern three-fourths of the plume is not likely to have migrated directly from the source zone. Instead, the shallow zones were likely cross-contaminated by diffusion from the lower zone or by upward smearing of contamination when groundwater elevations rose during natural fluctuations of recharge."

---

[4] Jeanine Tolson is a named plaintiff and resides within the 5 µg/L plume as defined by Arcadis; however, she does not seek to be a class representative in this case because pursuant to the full collection of data reviewed by Dr. Laton, she remains approximately one parcel outside the delineated 1.2 µg/L plume.

Ex. 34 p. 19.  TCE is present in the upper "siltey and clayey strata" regardless of any lesser groundwater results; instead, the contamination is present at all times despite isolated groundwater non-detects or low-detects.  *Id.* p. 20 ("a non-detect in one sample at any given time at any specific location does not mean that detectable levels would not be present there at some other time. Such non-detects, therefore, do not negate my opinion that ground water under every property in the identified Class Area is contaminated.").

      Mr. Anastasi further confirmed this in his deposition:

> Q.     So, in your opinion, is TCE currently present at concentrations of 1.2 micrograms per liter or higher beneath the entire contour as mapped by Earth Forensics?
>
> **A.     Yes.  As I state in my report, I think it's more likely than not it is.**

Ex. 35. p. 132:9-14.

      Mr. Anastasi explained that the 1.2 μg/L number is a relevant number to identify the presence of contamination because based on his knowledge of groundwater testing and laboratory analysis, 1.2 μg/L is "a real indication of what level of TCE was there for that sample."  *Id.* p. 98:8-9; *see also id.* p. 98:14-16 (testifying the 1.2 μg/L number is good "[f]or defining the area where TCE really is is what I used it for.").  That is, it is a reliable sampling number that confirms the presence of UP's carcinogenic TCE actually in the groundwater or upper strata where the 1.2 μg/L plume is delineated.

      Finally, Mr. Anastasi also explained that UP's remediation plan has been negligently inadequate for more than 20 years:

> The remedial actions implemented to date by UP contractors have been and continue to be inadequate to remediate the TCE and associated chlorinated hydrocarbon compounds that are distributed throughout the sediments that fill the former stream channel under the Class Area. As such, UP has failed to remediate the TCE and associated compounds in the Class Area in a reasonably prudent manner considering the circumstances.

Ex. 34 p. 20.   He specifically identified a more aggressive approach that would be necessary to remediate this plume.  He agreed with an Arcadis suggestion in 2010 of a "high-density network of injection zones spaced a few blocks apart down the width of the plume from the source area to its southern extent," which he called "carpet-bombing" the plume.  *Id.* p. 21.  However, UP declined this approach and continued with inadequate remediation that leaves the plume intact to this date.

### iii.   Mark Kram, Ph.D.

Dr. Kram offers two primary hydrogeological opinions: 1) that the indoor air testing is not a reliable means of assessing contamination or ruling out exposure; and 2) that mitigation systems must be urgently installed.[5]

First, the indoor air vapor intrusion investigations are not being carried out with reliable methods to adequately characterize concentrations of TCE or exposure:

> There were only three very limited VI investigations between the time the Defendant's toxic release had been detected circa 1994 and by early 2024 (e.g., 2004, 2009, 2012-2013; Arcadis, 2023). For each of these investigations, TCE was documented in indoor air. None of the properties tested have been sampled with reliable methodology capable of ruling out indoor air exposure.

Ex. 8 p. 32.  In conjunction with this, it is far more difficult to use indoor air testing to obtain a reliable assessment of exposure at any given property than what UP is performing.  Instead, a "reasonable maximum exposure" must be deciphered:

> USEPA acknowledges that exposure concentrations can be dynamic (USEPA, 2015). To address this, USEPA (2015) recommends that all VI risk management decisions be based on the reasonable maximum exposure (RME), which occurs during VI "on" conditions (Figure 7). RME was not determined for any of the Wichita properties assessed for vapor intrusion. In fact, the methods used by the Defendant are documented to be prone to underestimation of risk and flawed conclusions (Holton et al., 2013; Schuver et al., 2018).

> \*\*\*

---

[5] Dr. Kram also criticizes the remediation of the groundwater plume to 5 μg/L indicating that the 5 μg/L concentration still represents a danger to the class members of the groundwater plume.  Ex. 8, Kram. Rpt. p. 24; *see also infra*, § V.c.i.1.Negligent Remediation.

USEPA (2015) further states:

"Collect indoor air samples to characterize exposure levels in indoor air, account for seasonal variations in climate and the habits of building occupants, and ensure that related risk management decisions are based upon a consideration of a reasonable maximum vapor intrusion condition for a given building…EPA recommends basing the decision about whether to undertake response action for vapor intrusion (i.e., a component of risk management) on a consideration of a reasonable maximum exposure… EPA recommends characterizing spatial and temporal variability to increase confidence in data evaluation and decision-making and ensure consideration of a reasonable maximum vapor intrusion condition."

*Id.* p. 43. Peer-reviewed literature asserts "that 58 randomly timed time-integrated samples within a structure would be required to achieve a 95% level of confidence in an RME estimate for that structure." *Id.* p. 45 (citing Schuver, H.J., C. Lutes, J. Kurtz, C. Holton, and R.S. Truesdale, 2018. Chlorinated Vapor Intrusion Indicators, Tracers and Surrogates: Supplemental Measurements for Minimizing the Number of Chemical Indoor Air Samples – Part 1: Vapor Intrusion Driving Forces and Related Environmental Factors; Remediation, v.28, p.7-31). UP has not attempted this effort.

At her deposition, Brooke Glasrud, Arcadis' senior geologist specialist in charge of the Vapor Intrusion Work Program, acknowledged that the USEPA VI Guidance is a guidance document she relies on in her work. Ex. 36 p. 19:13-20. Upon examination, she had to confirm that USEPA Guidance states that a single indoor air test, like the ones being performed by Arcadis, may underestimate reasonable maximum exposure depending on many factors. *Id.* p. 147:2-14. However, upon examination, Ms. Glasrud, who testified she referenced this Guidance, also indicated she was wholly unfamiliar with a "reasonable maximum exposure." *Id.* p. 146:13-19.

Because the indoor air data is not reliable, Dr. Kram opines about the danger to the class members based upon the presence of groundwater contamination. He explains that EPA's groundwater screening level of 1.2 μg/L corresponds to an increased and unacceptable risk of harm to the class members above such a plume.

- Delineate the groundwater plume to 1.2μg/L, which is consistent with the EPA risk assessment threshold of 0.48 μg/m3 for indoor air exposure.
- All homes over the 1.2 μg/L groundwater plume should receive mitigation systems as soon as possible.

Ex. 8 p. 24.  It is the presence of TCE **in the groundwater** at a concentration of 1.2 μg/L or greater that presents this danger to the class members and demands urgent mitigation.

Due to the overwhelming time and expense of properly investigating indoor air for the 2,700-plus contaminated properties, and the imposition and risk placed on residents during such an investigation, Plaintiff's VI expert, Dr. Kram, determined "it is my opinion that mitigation systems be immediately installed for each home located above areas of the groundwater plume that exceed the screening limit…" *Id.* p. 27; *see also id.* p. 38 ("Consistent with USEPA regulatory policy, it is my opinion that every building residing above 1.2 μg/L TCE groundwater concentration is at-risk for VI and requires immediate mitigation.").

Dr. Kram's opinion concluding that preemptive mitigation is necessary is further bolstered by the same EPA Guidance.  It states that when groundwater wells have delineated a plume of contamination, soil gas samples have been taken, and a few homes have been sampled for indoor air:

> the assumption can be made that buildings with similar construction and built about the same time may have similar susceptibility to soil gas entry. As a result, it may be determined to use a [preemptive mitigation] approach to offer mitigation systems to all buildings within a specified area of subsurface contamination.

Ex. 37 p. 138; *see also* Ex. 36. pp. 176:13-180:22 (acknowledging this Guidance Section but disputing only the there is an unacceptable human health risk).

### iv.  Thomas Hatton

Mr. Hatton is a technical expert in the field of vapor intrusion mitigation who offers a cost estimate for the installation of appropriate mitigation systems in the homes in the Class Area.  Mr. Hatton performed a site visit of the PCA and reviewed relevant documents, including City of Wichita

property records that document specific information necessary to identify a cost range of mitigation installation.

Mr. Hatton noted there are two types of homes in the Class Area: 1) single-family single-story ranch homes; and 2) single family two story residences.  These home styles are distinct from one another because ranch homes include a crawl space while the two story homes have basements.

He also identified that there would be costs associated with design and installation and then subsequent associated with operation and maintenance.  Regardless of the type of home, he offered an estimate of the damages of each:

**3.1.1   Design and Installation Cost**

| | Diagnose and Design | | Mitigation System Installation | |
|---|---|---|---|---|
| | Quantity per Mobe | Quantity per Mobe | Quantity Per Mobe | Quantity Per Mobe |
| Style of Home | Cost Per House | Cost Per House | Cost Per House | Cost Per House |
| Ranch w/ Crawl Space | 2 to 8 homes / mobilization $8,800 | 9 + homes / mobilization $7,900 | 2 to 8 homes / mobilization $28,000 | 9 + homes / mobilization $24,000 |
| Salt Box w/ Basement and Crawlspace | 2 to 8 homes / mobilization $9,100 | 9 + homes / mobilization $8,300 | 2 to 8 homes / mobilization $24,000 | 9 + homes / mobilization $21,000 |

Ex. 38 p. 5.  "Diagnose and Design" ranges between $8,300 and $9,100 dollars, while "Mitigation System Installation" ranges from between $21,000 and $28,000 dollars per home.  This is a narrow range of damages for Design and Installation.

He also identified costs associated with future maintenance and operation for each type of home:

**3.1.2   Operations, Maintenance, and Monitoring (OM&M) Cost**

| | | OM&M Year One | OM&M Year Two Into the Future |
|---|---|---|---|
| | Secure Modem Telemetry | Four Quarterly Inspections | One Annual Inspection |
| | Multiple Metrics | Physical Onsite Inspection and Report | Physical Onsite Inspection and Report |
| | Annual Cost per House | Annual Cost per House | Annual Cost per House |
| 2 to 8 Homes | $1,100 | $7,800 | $2,300 |
| 9+ Homes | $1,100 | $7,000 | $2,000 |

*Id.* p. 6.  The range on these is likewise narrow and even without consideration to the type of home is within $1,100 per home.

However, Mr. Hatton also reviewed City of Wichita data that specifically identifies each home in the PCA has either having a crawl space or a basement.  With that, each individual home can be assessed a precise damage related to the cost of mitigation.

### v.  Richard Zabel, Ph.D.

Dr. Zabel is an expert in urban and real estate economics, environmental economics, labor economics, and the economics of education.  Ex. 39.  He offers a simple opinion that the current market value of properties can be evaluated with publicly accessible data.

> In this case, the relevant authority for assessing property taxes (SCAO) provides current estimates of market value derived from several approaches commonly applied by appraisers and real estate professionals. This provides a current, consistent, and accessible source of data for class properties. Property transaction data can then be compared to SCAO-reported values to further refine these estimates. It is my opinion to a reasonable degree of certainty that the value of each of the residential properties can be determined by applying this methodology to the data available.

*Id.* p. 5.  In summary, Dr. Zabel's three-step process for assessing current market value of homes on a class-wide basis is: (1) obtaining assessed values from the Sedgwick County assessors office; (2) collect actual transaction data in the PCA; and (3) adjust, as necessary, the assessed values based on actual market transactions. Ex. 40 pp. 206:9-208:1. To be clear, as he testified, Dr. Zabel was not asked to determine whether the class area homes suffered diminution in value due to UP's TCE plume. *Id.* pp. 129:6-7 ("We were not asked in any way to calculate diminution of value.").

### IV.    LEGAL STANDARD

"Whether to certify a class is committed to the broad discretion of the trial court." *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 256 (D. Kan. 2010) (Melgren, J.). "In exercising this discretion, the

Court should err on the side of class certification because it has the authority to later redefine or even decertify the class if necessary." *Id.*[6]

Rule 23 provides the requirements for certifying a class action. "Plaintiffs must demonstrate the putative class satisfies four requirements under Rule 23(a) and one of three alternative requirements under Rule 23(b). The four Rule 23(a) requirements are:

> (1) numerosity, meaning 'the class is so numerous that joinder of all members is impracticable';
> (2) commonality, such that 'there are questions of law or fact common to the class';
> (3) typicality, meaning 'the claims or defenses of the representative parties are typical of the claims or defenses of the class'; and
> (4) adequacy, such that 'the representative parties will fairly and adequately protect the interests of the class.'"

*Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1187 (10th Cir. 2023) (quoting Fed. R. Civ. P. 23(a)).

A Rule 23(b)(3) class seeking monetary relief must satisfy two additional requirements: predominance and superiority. *Sherman*, 84 F.4th at 1187. Rule 23(b)(3) requires that "questions of law or fact common to class members ***predominate*** over any questions affecting only individual members, and that a class action is ***superior*** to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added).

The district court must "undertake a rigorous analysis to satisfy itself that a putative class meets the applicable Rule 23 requirements." *Id.* However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). And "the district court 'must generally accept the substantive, non-conclusory allegations of the complaint as true.'" *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1174 (10th Cir. 2023) (quoting *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).

---

[6] All internal citations, quotations, and alterations omitted unless otherwise noted.

The court may also certify a class limited to specific issues. Rule 23(c)(4) provides that, "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." *Black*, 69 F.4th at 1173 . In 2023, the Tenth Circuit held, as a matter of first impression, that "certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself satisfies the requirements of Rules 23(a) and 23(b)." *Id.* at 1188.

The Sixth Circuit recognized that certifying specific issues for class treatment may help resolve environmental cases. *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 414–15 (6th Cir. 2018), *cert. denied*, 139 S.Ct. 1319 (2019) (holding that issues certified for class resolution "need only be answered once because the answers apply in the same way to each property owner within the plumes."). Since *Martin*, Courts have recognized "a more permissive approach to Rule 23(c)(4) certification…on the theory it better serves the purposes of Rule 23 by providing courts with greater flexibility in managing potential class actions." *In re Chiquita Brands Int'l Inc.*, 331 F.R.D. 675, 687 (S.D. Fla. 2019).

V. <u>**ARGUMENT**</u>

a. **Plaintiff has Proposed an Objectively Defined Class**

A class "definition must be precise, objective, and presently ascertainable." *Eatinger*, 271 F.R.D. at 257. The definition must be "sufficiently defined so as to allow potential class members to be identified." *Id.* at 258. Additionally, the Tenth Circuit "treats ascertainability as a sub-requirement of numerosity." *Evans v. Brigham Young Univ.*, 2023 WL 3262012, at *5 (10th Cir. May 5, 2023); *Rider v. OXY USA, Inc.*, 2025 WL 1707377, at *6 (D. Kan. June 18, 2025). Since the Tenth Circuit has not adopted a standard for ascertainability, courts in this district typically follow the Seventh Circuit's standard that show ascertainability by "defining classes clearly and with objective criteria." *Id.* at *6 (quoting *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 672 (7th Cir. 2015)).

"Reference to fixed, geographic boundaries will generally be sufficiently objective for proper inclusion in a class definition." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538–39 (6th Cir. 2012). Environmental class areas often reflect a geographic area impacted by contamination. *Delta*, 2023 WL 2347074, at *3; ; *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Col. 1993) (certifying class defined by geographic boundaries based on contours of leaking radioactive materials for claims of negligence and private nuisance); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67–68 (S.D. Ohio 1991) (certifying class defined as persons within six miles of plant that released contaminants)

Here, the PCA is based on Dr. Laton mapping TCE contamination to a concentration of 1.2 µg/L and Plaintiff moves for certification of the following Class:

> **Any and all persons that currently own any single family home residential real property depicted by the area outlined in dashed line below representing groundwater contamination of 1.2 µg/L.**



Ex. 33.  Any parcel that intersects the dotted blue line or is within the boundary of it is included in the definition.  Pink homes are on a plume in excess of 5 µg/L.  Green homes are in excess of 1.2 µg/L.  The class includes all homes above 1.2 µg/L (both pink and green homes).  Excluded from the class are the Defendant, any entity that has a controlling interest in the Defendant, their legal

representatives, officers, directors, assigns, successors, employees, agents and members of their immediate families; governmental and the judicial officers to whom this case is assigned, their staff, (and the members of their immediate families).

### b. Rule 23(a) has been Satisfied

#### i. Numerosity

Rule 23(a)(1) requires plaintiffs to show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Plaintiffs must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Eatinger*, 271 F.R.D. at 258. Although Rule 23(a)(1) does not specify a minimum number of plaintiffs to obtain class certification and the Tenth Circuit has not adopted a presumptive number, courts in this district have held that even a class of 20 to 50 meet the standard. *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 504 (D. Kan. 2014) (Melgren, J.); *Zuniga v. Bernalillo Cnty.*, 319 F.R.D. 640, 687 (D.N.M. 2016) (finding that several hundred tenants and homeowners or 230 plaintiffs makes joinder impracticable.). Here, class membership includes over 2,700 PCA homeowners. This information has been gathered from publicly available information and is part of Dr. Laton's report. Ex. 6 p. 34. Likewise, the number of homeowners in the proposed class area is not seriously in dispute. Therefore, numerosity exists.

#### ii. Commonality

"Questions of law or fact common to the class" under Rule 23(a)(2) exist when plaintiffs rely on a "common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Yet, commonality "do[es] not require that every member of the class share a fact situation *identical* to that of the named

plaintiff." *Id.* "A finding of commonality requires only a single question of law or fact common to the entire class." *Id.*

Here, several common questions of law and fact exist for all class member claims that can be established in one action, including, but not limited to, whether:

- UP's acts or omissions at the Site proximately caused TCE to be released and migrate into, at, on, or around the PCA;
- UP failed to exercise reasonable care in their storing, use, disposal, containment, investigation, and remediation of TCE;
- TCE released from the Site migrated throughout the entire PCA;
- Properties within the PCA are contaminated with TCE; and
- TCE contamination at or above 1.2 µg/L has caused injury to the PCA properties necessitates mitigation of soil vapor.

Commonality was recently found in a similar TCE groundwater contamination class action. *Behar*, 2024 WL 4004052, at *11 (finding commonality for issues including whether defendant released TCE and PCE; whether defendant's conduct at the Site caused TCE and PCE to be released and contaminate the groundwater; whether TCE injured the class properties and "whether exceedance of the TCE contamination threshold of 1.2 µg/L necessitates mitigation.").

### iii.   Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P.  23(a)(3). Like commonality, typicality does "not require that every member of the class share a fact situation identical to that of the named plaintiff." *Sherman*, 84 F.4th at 1193. "Typicality requires only that the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* As a result, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* (quoting *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)).

In environmental cases, typicality is satisfied when the named plaintiffs and the class members are impacted by the same type of contamination caused by the same defendant. *See, e.g.*, *Rowe v. E. I. Dupont De Nemours*, 262 F.R.D. 451, 456 (D. N.J. 2009) (finding typicality established where claims "arise from the same course of conduct committed by DuPont, involve the same legal theories…and seek the same injunctive relief").

Here, the predominating issues involve UP's common course of conduct in handling, storing, and spilling TCE. The resulting TCE contamination is above the screening levels across the PCA impacting all class members in a similar way. Plaintiff and all class members have groundwater, soil, and soil vapor contamination on their properties, the same claims, and the same interest in the outcome of the case.

Plaintiff Black is a homeowner near the 29th & Grove Site. Ex. 41 p. 8:21-10:5. In 1974, Ms. Black purchased her current home at 923 North Piatt, which is in located in the PCA 1.2 µg/L plume. *Id.* Ms. Black's home is impacted by the same plume in the same manner that Plaintiffs have pled has impacted every other class member. She lives within the plume area that Plaintiff's experts have determined impacts their property's value and requires mitigation and this aligns their claims and their interest in pursuing those claims with those of every other class member.

### iv. Adequacy

A certified class must have representative parties who will fairly and adequately protect the interests of the class. *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1873989, at *19 (D. Kan. Feb. 27, 2020) (citing Fed. R. Civ. P. 23(a)(4)). Adequacy asks whether plaintiffs or counsel "(a) have any conflicts of interest with other class members and (b) will prosecute the action vigorously on behalf of the class." *Id.*

"To defeat class certification, a conflict must be fundamental and go to specific issues in controversy." *Eatinger*, 271 F.R.D. at 260. "A fundamental conflict exists where some members of the

class claim harm through a representative plaintiff's conduct that resulted in benefit to other class members." *Id.* "Minor conflicts will not defeat class certification." *Id.*

First, Ms. Black has no conflicts with other class members. She resides within the 1.2 µg/L plume—like all PCA residents—and has been injured as a result. UP may argue that Ms. Black is not an adequate representative because other homes nearer to the Site have different risk. This argument, however, is misguided. First, when the injuries result from the same conduct, the injuries must only be "similar." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *see also Bentley v. Honeywell Int'l*, 223 F.R.D. 471, 485 (S.D. Ohio 2004) (finding harm of same type may differ as to "degree"). More importantly, Plaintiff's injury claims can be established by common evidence. Injury to the Class is based on the presence of TCE at each property exceeding 1.2 µg/L—a condition that applies for every PCA home. Ex. 33. Ms. Black has suffered the same harm from UP's conduct—TCE contamination at her property—as all other putative class members. The first question is satisfied.

Second, Plaintiff retained counsel who are qualified and experienced in prosecuting complex environmental class actions. Mark Lanier is a nationally recognized trial lawyer who has served as lead counsel in numerous mass tort and class action cases, including environmental cases. Christopher Nidel, an M.I.T. chemical engineer, has also served as lead counsel in several environmental and class action cases. Ari Kresch has 45 years of legal experience with a specialty in mass torts. Rick Griffin from Martin Pringle is serving has local counsel and his firm have been actively engaged in litigating the case including attending discovery conferences and providing deposition support. Plaintiff's counsel has vigorously litigated the claims made in this case for over 2 years, reviewing hundreds of thousands of documents, hiring five experts, taken 7 key depositions to date, as well as defeating multiple motions to dismiss. Counsel possess the knowledge, resources, experience, and commitment to adequately represent the class. The second question is satisfied.

31

### c. Rule 23(b)(3) has been Satisfied

In addition to satisfying all the requirements of Rule 23(a), Plaintiff satisfies the requirements of 23(b)(3). Here, the questions that predominate in this litigation are (a) whether UP discharged contaminants onto Plaintiff's and the class members' properties; (b) whether UP failed to properly contain or remediate those contaminants; and (c) whether the properties need mitigation based upon the presence of that contamination.

### i. Predominance

"Rule 23(b)(3)'s predominance requirement is related to, albeit 'more demanding than,' Rule 23(a)(2)'s commonality requirement." *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

To assess predominance, the district court must determine "'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:49 at 195–96 (5th ed. 2012)). Common issues are those "susceptible to generalized, class-wide proof" or for which "the same evidence will suffice for each member to make a prima facie showing"; individual, aggregation-defeating issues are those for which "members of [the] proposed class will need to present evidence that varies from member to member." *Id.* (quoting Newberg § 4:50 at 196–97). "Notably, it is not necessary for a plaintiff to show that all of the elements of the claim entail questions of fact and law that are common to the class or that the answers to those common questions are dispositive." *Sherman*, 84 F.4th at 1194.

"So long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)— even if there remain individual issues, such as damages, that must be tried separately." *Id.*; *Tyson Foods*, 577 U.S. at 453.

Predominance is qualitative and not determined "simply by counting noses." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Where "common questions predominate regarding liability, the courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 n.7 (S.D. Cal. 2012) (quoting *Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)). The inquiry is focused on whether common questions predominate over individual questions—not whether there are "common answers to those questions." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012).

When just one common question predominates "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately...." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); *Leyva*, 716 F.3d at 514 (finding predominance in wage-and-hour class based on liability); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167–68 (9th Cir. 2014) (holding that issues of liability predominate over individualized assessment of damages).

Class certification is appropriate when a defendant's common course of conduct toward all homeowners within a confined, geographic boundary results in damage to properties. *See In re Delta Airlines*, 2023 WL 2347074, at *14, 17 (C.D. Cal. Feb. 8, 2023) (certifying Rule 23(b)(3) trespass class for jet fuel released on homes); *see also Mejdrech*, 319 F.3d at 911–12; *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir. 1988). Recently, in *Behar v. Northrop Grumman*, the district court found that common issues predominated in a TCE groundwater contamination case involving a plume under 3,200 homes for claims of negligence, trespass and nuisance. *Behar*, 2024 WL 4004052, at *11.

## 1. Common issues predominate over individual issues for each of Plaintiff's causes of action

The predominant questions that overwhelm any individualized issues include (a) whether UP discharged contaminants onto Plaintiff's and the class members' properties; (b) whether UP failed to properly contain or remediate those contaminants; and (c) whether the properties need mitigation based upon the presence of that contamination. And the ultimate dispute that answers these questions

is whether the presence of contamination within the plume of 1.2 μg/L of TCE groundwater contamination necessitates mitigation.  UP contests this question for each member in the same way, asserting that groundwater concentration of 1.2 μg/L is an "acceptable risk."  Plaintiff disputes that this concentration is an acceptable risk, or that she should accept ***any*** risk of cancer from UP releasing TCE.  The merits of this question do not undermine predominance because its ultimate resolution applies to each PCA member on the same evidence.

The merits of each claim rests on evidence of UP's conduct and the migration, source, and presence of TCE in the PCA (causation) as discussed above. These together form the bases for UP's liability. These can be established through common evidence for all class members for each of the common law claims. *Behar*, 2024 WL 4004052, at *11.

***Negligence***: Negligence requires that defendant owed plaintiff a duty; breach; proximate causation; and damages. *Brown*, 2017 WL 8944043, at *3. In *Brown*, this Court denied a motion to dismiss where plaintiffs pled a "duty not to allow the escape of toxic substance," breach and causation by allowing "unreasonable conditions to exist" like "equipment that failed, ruptured or leaked," and damages. *Id.* Here, Plaintiff pled negligence where UP had a duty to protect neighbors from its TCE, mishandled that toxic substance that created a toxic plume, and necessitates mitigation. Doc. 54 ¶¶ 1, 14–20, 36.

Here, evidence of UP's common course of conduct to all class members will answer the common questions establishing the negligence claim. *Sterling*, 855 F.2d 1188, at 1196–97. Evidence that UP improperly released TCE, contaminating the water, soil, and vapors across all PCA homes and have failed to properly test for and remediate those contaminants, thereby breaching their duty to Plaintiff, is likewise common. Causation—whether, how and to what extent TCE released from the Site has contaminated the PCA properties—can also be established through common evidence. Here, UP's own data establishes the class-wide presence of TCE in the groundwater at levels above a

34

concentration of 1.2 μg/L causing common injury. Each class members' claim is thus established through evidence of conduct, migration, and contamination common to all class members.

Because common questions of liability predominate over potential individualized damages questions courts frequently certify negligence claims in environmental cases. For instance, in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 (E.D. La. 2006), the court found that the individual issue of the extent of contamination on a particular property did not require extensive individualized proof that would preclude class treatment of the negligence claim. *Behar*, 2024 WL 4004052, at *13 (certifying negligence claim after finding predominance standard met).

**Negligent Remediation:** Kansas recognizes a cause of action for negligent remediation, as this Court already ruled. *Black II*, 2024 WL 3741404, at *7 ("plaintiffs have adequately pled a claim for negligent remediation."). Negligent remediation claims have been tried when defendant voluntarily agreed to remediate and used professional companies that had a duty to remediate with reasonable care. *City of Neodesha v. BP Corp.*, 334 P.3d 830, 844 (Kan. Ct. App. 2014). Here, Defendant has not applied remediation at any individual house but has sought to remediate the entire plume. It has done so negligently as demonstrated by Mr. Anastasi. *Supra*.

Further, the question of the appropriate remediation cleanup concentration also predominates. Even now, UP seeks only to remediate to 5 μg/L in the groundwater; however, Plaintiff's experts assert that this is not sufficient because homes above the 1.2 μg/L TCE plume have an unacceptable risk from the groundwater contamination. Ex. 8 p. 24 ("Groundwater mitigation should continue until four quarterly samples from multiple, i.e. nearly all, monitoring wells in the Class Area confirm TCE has been reduced to concentrations below USEPA's 1.2 μg/L threshold.").

For this injury, Plaintiff seeks mitigation damages, which is a question that can be answered with evidence common to all class members.

*Continuing Nuisance*: "Under Kansas law, a private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his land." *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1267 (10th Cir. 2012). The four elements are (1) intent of interfering with use and enjoyment or knowledge of continuing to cause such a condition; (2) some interference with use and enjoyment ; (3) substantial interference; and (4) unreasonable interference. *Id.* at 1267-69. Nuisance "may be brought on a theory of intentional conduct, negligence or strict liability." *Macias v. BNSF Ry. Co.*, 2020 WL 3469680, at *8 (D. Kan. 2020).

In *Brown*, this Court held that defendant allowing gas condensate to invade plaintiff's land and cause interference pled a nuisance claim. *Brown*, 2017 WL 8944043, at *4. In *Renne*, this Court denied a motion to dismiss a nuisance claim where the complaint alleged that defendant's wind turbine disrupted construction plans by creating noise and shadows. *Renne v. NextEra Energy, Inc.*, 2022 WL 2918123, at *10 (D. Kan. July 25, 2022).

The interference here is the presence of TCE at all PCA properties. As with other claims, the source of this plume is established by common evidence. The remaining elements are also answered by common evidence, namely the toxicity of TCE and the significance of its presence on property damage and the need for mitigation.  UP's liability for this nuisance is entirely determined by answering common questions through common evidence for all class members' claims based on an objective standard that a jury must decide. *Cook*, 151 F.R.D. at 382 (finding that common issue predominated for class of landowners asserting contamination claims for negligence and nuisance).

Further, each home requires mitigation as modeled by Mr. Hatton.  This will cause several days interference with their property as the system is installed.  And pursuant to Mr. Hatton's testimony, the installation is substantially the same amount of days for every class member.

*Continuing Trespass*:  "A trespasser is a person who intentionally enters or remains upon land in the possession of another without a privilege to do so." *Ottawa N.R.R.  v. City of Baldwin*, 2023 WL

7923152, at *13 (D. Kan. Nov. 16, 2023). Plaintiff's trespass claims arise from UP's releases of hazardous wastes into the community and onto Ms. Black's property and the proposed class members' properties. *Schaeffer v. Gregory Village Partners, L.P.*, 105 F.Supp.3d 951, 956 (N.D. Cal. 2015) (holding that PCE contamination under plaintiff's home raise triable issues on negligence, trespass, and nuisance claims). As with the negligence claim, UP's liability for trespass will be established with common evidence. UP's common conduct, contaminant migration, presence, and harm, and the role UP had causing that harm are common questions all established by common evidence. *Delta*, 2023 WL 2347074, at *13–14 (certifying contamination trespass claim with expert evidence of common cause); *Brown v. St. Gobain Performance Plastics*, 2023 WL 9023158, at *12–13, (D. N.H. Dec. 29, 2023) (certifying toxic groundwater trespass class).

### *Kansas Discharge Statute K.S.A. 65-6203:*

"K.S.A. 65-6203 is a public health law making anyone who accidentally releases or discharges materials detrimental to the quality of the water or soil in this state responsible to the owner of the affected property for compensatory damages." *City of Neodesha*, 334 P.3d at 847. § 65-6203 states that "it shall be the duty of any person responsible for an accidental release" that contaminates water or soil to "compensate the owner of the property" and "comply with all rules and regulations . . . designed to ensure the prompt correction of any such release or discharge." K.S.A. § 65-6203. The statute imposes strict liability and, unlike Kansas common law, does not require engagement in an abnormally dangerous activity. *Eastman v. Coffeyville Res. Ref. & Mktg. LLC*, 295 Kan. 470, 477 (2012).

Like Plaintiff's other claims, this cause of action rises and falls on the same common question proven by common evidence: did UP cause a release of TCE onto Plaintiff's and the class members' properties. Therefore, this cause of action is apt for class certification as common questions predominate any individualized ones.

### 2. Property Mitigation Damages can be Determined Class-Wide

"The fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013). Courts frequently hold that individualized damage issues do not defeat predominance. *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922–23 (10th Cir. 2018). Therefore, because the predominant question is whether the presence of TCE requires mitigation predominates, even with disparate damages analysis, this case should be certified. However, here Plaintiff has offered a model of mitigation damages that allows for common proof of damages as well. *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019) (approving certification of damages where expert could determine damages on classwide basis).

Here, Tom Hatton analyzed the homes in the PCA and reliably estimated mitigation costs for the two types of homes found in the PCA. He specifically created an option for each of the two types of homes that are present in the PCA. Based on this, he developed a reasonable estimate of the range of damages that would be necessary to compensate the homeowners for mitigation systems. In conjunction with Dr. Laton's map and City of Wichita data indicating the type of crawlspace or basement in each home, each home can be assessed for damages in one swoop. Therefore, damages should be certified for classwide treatment.

### ii. Superiority

For Rule 23(b)(3), Plaintiff must show that a class is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A non-exhaustive list of factors relevant to superiority includes:

> (A) the class members interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "[C]ourts and commentators have observed that the Rule 23(b)(3) class action is superior when it allows for the 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (quoting *Amchem*, 521 U.S. at 617); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017) (crediting unlikelihood that class members would individually pursue claims due to risks, small recovery, and litigation cost as consideration "at the heart" of superiority analysis). For this reason, "the class action device is especially pertinent to vulnerable populations." *Id.* (quoting Newberg § 4:65).

Here, a class is clearly superior because the cost of pursuing individual claims greatly exceeds the potential recovery for each class member. While the cost sought per home is not insignificant, it is also not feasible for any individual person for an individual case, given the need to retain qualified counsel, for numerous experts, and other costs associated with litigation. Moreover, requiring duplicative discovery and multiple trials regarding the same issues would be wasteful, unfair to the litigants, and consume significant judicial resources. *Martin*, 896 F.3d at 416. If Plaintiff cannot proceed as a class, most—if not all—will barred from proceeding individually given the disparity between litigation costs and their potential recovery.

Managing this class action will pose no exceptional difficulties. No issues have arisen indicating that a class action will be more difficult than litigating potentially thousands of individual cases. Finally, concentrating the litigation in this Court is desirable because it is familiar with this matter, and it is the proper venue for claims arising from contamination in a Wichita neighborhood.

### d.  Alternatively, a Rule 23(c)(4) Issue Class should be Certified

The Court may alternatively certify specific issues pursuant to Rule 23(c)(4). In recent appellate treatment of this Rule's application to environmental cases, the Sixth Circuit recognized that Rule

23(c)(4) may help resolve contamination lawsuits. *Martin*, 896 F.3d at 414–15. Here, like in *Martin*, there are numerous issues that can, and should, be resolved class-wide because their resolution will substantially advance resolution. *Id.* Thus, if the Court rejects certification under Rule 23(b)(3), it should certify these issues, including liability and injury, for class treatment under Rule 23(c)(4). This will promote judicial efficiency as well as efficiencies for UP, avoid the risk of inconsistent outcomes, and advance the resolution of all claims.

### e.  Class Definitions can be Modified and Subclasses Identified

Redefining a class or creating subclasses should be considered by a district court before drastically denying certification. *Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) ("If the court finds that the proposed definition is not sufficiently definite, it may modify the definition instead of dismissing the proposed action."); *Heaven v. Trust Company Bank*, 118 F.3d 735, 738 (11th Cir. 1997) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980)).  The D.C. Circuit explained that rather than reject certification, "a district court should either define the class itself or, perhaps most productively, simply suggest an alternate class definition..." *In re White*, 64 F.4th 302, 315 (D.C. Cir. 2023); *Chiang v. Veneman*, 385 F.3d 256, 268 (3d Cir. 2004) (same).

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff moves for class certification pursuant to Rule 23(b)(3).  In the alternative, Plaintiff moves pursuant to Rule 23(c)(4) for certification of an issue class for the reasons stated in the accompanying Memorandum, or for the certification of alternative or subclasses.

Plaintiff also moves for the appointment of undersigned counsel as counsel for the class and for appointment of Faye Black as class representative.

Respectfully submitted,

MARTIN, PRINGLE, OLIVER,
WALLACE & BAUER, L.L.P.

/s/ William R. Griffin
William R. Griffin, #21628
645 E. Douglas, Suite 100
Wichita, KS 67202
Tel: (316) 265-9311
Fax: (316) 265-2955
wrgriffin@martinpringle.com

Ryan D. Ellis (admitted PHV)
Ryan.Ellis@lanierlawfirm.com
Texas Bar No. 24087470
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N
Houston, TX 77064
Tel: (713) 659-5200
Fax: (713) 659-2204

Christopher T. Nidel (admitted PHV)
DC Bar No.: 497059
chris@nidellaw.com
Jonathan Nace (admitted PHV)
DC Bar No.: 985718
jon@nidellaw.com
William W. Cowles (admitted PHV)
NY Bar No.: 5120928
will@nidellaw.com
**NIDEL & NACE, P.L.L.C.**
One Church Street, Suite 802
Rockville, MD 20850
Tel: (202) 780-5153

Ari Kresch, Esq. (admitted PHV)
akresch@1800lawfirm.com
**KRESCH LEGAL SERVICES PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Tel: (800) 529-3476

Steven J. German (admitted PHV)
**GERMAN RUBENSTEIN, LLP**
19 West 44th Street, Suite 1500
New York, NY 10036
Tel: (212) 704-2020

*Attorneys for the Plaintiffs and the*
*Putative Class Members*