**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

FAYE BLACK, et. al,

                Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

                Defendant.

Case No. 6:23-cv-1218-EFM-ADM

(Oral Argument Requested)

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. MARK KRAM

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 2

III.    LEGAL STANDARD.......................................................................................... 3

IV.    ARGUMENT ...................................................................................................... 4

    A.    Dr. Kram's opinions related to risk of potential harm from vapor intrusion for residential properties located above Dr. Laton's plume should be excluded because he applies the wrong standards to insufficient facts................................. 5

        1.    Dr. Kram improperly relies on EPA screening levels to allege potential harm rather than KDHE's screening levels. ................................................ 5

        2.    Dr. Kram conflates "screening levels" and "action levels" resulting in exaggerated projections of vapor intrusion risks. ...................................... 8

        3.    Dr. Kram failed to verify or even review Dr. Laton's methodology, and that methodology undermines Dr. Kram's opinions................................. 9

        4.    Dr. Kram acknowledged but failed to account for the variability in risk factors among the individual homes in the proposed class area. ............. 12

    B.    Dr. Kram's opinion that class-wide "preemptive mitigation" should be required is inconsistent with applicable standards and practices and unsupported by data. ................................................................................................................ 12

        1.    Dr. Kram's opinions on preemptive mitigation again are not supported by the level of risk demonstrated in testing or by the EPA guidance he relies upon. .................................................................................................. 13

        2.    Dr. Kram's mitigation opinion relies on baseless estimates for costs of further testing. ......................................................................................... 15

    C.    Kram's cost estimates for vapor intrusion mitigation should be excluded under Rule 702 as unreliable and unsupported by sufficient facts and data. ................. 16

V.    CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bd. of Cnty. Com'rs of Cnty. of La Plata, Colorado v. Brown Group Retail, Inc.*,
768 F. Supp. 2d 1092 (D. Colo. 2011) .......................................................................13

*Brayman v. KeyPoint Gov't Sols., Inc.*,
83 F.4th 823 (10th Cir. 2023) ....................................................................................2

*City of Las Cruces v. Lofts at Alameda, LLC*,
618 F. Supp. 3d 1192 (D.N.M. 2022) ..................................................................11, 17

*Cochrane v. Schneider Nat'l Carriers, Inc.*,
980 F. Supp. 374 (D. Kan. 1997) ...............................................................................3

*Coe v. Cross-Lines Ret. Ctr., Inc.*,
No. 22-2047, 2023 WL 3534328 (D. Kan. May 18, 2023)...........................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................................................................................................3

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) .........................................................................3, 8, 9

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997).....................................................................................................4

*Hall v. ConocoPhillips*,
248 F. Supp. 3d 1177(W.D. Okla. 2017) ...................................................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).....................................................................................................2

*Roe v. FCA US LLC*,
42 F.4th 1175 (10th Cir. 2022) ........................................................................3, 4, 12

*United States v. Nacchio*,
555 F.3d 1234 (10th Cir. 2009) ...................................................................................3

*Zapata v. IBP, Inc.*,
167 F.R.D. 147 (D. Kan. 1996)....................................................................................2

## I. INTRODUCTION

Defendant Union Pacific moves this Court to exclude the expert testimony of Dr. Mark Kram under Federal Rule of Evidence 702.  Plaintiffs presumably will offer Dr. Kram's testimony in an effort to establish common class-wide injury and remedies for a purported class of residential properties overlying an alleged groundwater plume drawn by another Plaintiffs' expert, Dr. Laton. According to Dr. Kram, every property above Dr. Laton's plume is at risk of potential TCE vapor intrusion (despite contrary indoor air sampling results) and should be immediately mitigated (despite contrary determinations by the Kansas Department of Health and the Environment ("KDHE")) at a cost that he estimates to exceed $500 million.

But Dr. Kram's testimony is built on unreliable assumptions and insufficient facts and cannot assist this Court in evaluating class certification issues:

- First, ignoring the applicable KDHE screening levels, he claims without support that exceedance of certain, non-applicable EPA "screening levels" for vapor intrusion—which EPA states should not be used as response action levels—should be used to establish the existence of harmful risks that require mitigation.

- Then, relying on these "screening levels" and derivative "plume mapping" generated by Plaintiffs' expert Dr. Laton, Dr. Kram opines there exists a current, common risk to properties in Dr. Laton's plume that is not supported by the data underlying the plume mapping—data that Dr. Kram did not review.

- Notwithstanding the absence of TCE concentration levels that would require mitigation under applicable Kansas screening levels, Dr. Kram leaps to the conclusion that payment for indoor air mitigation across all 2,319 properties in the class should be required.

- Finally, to construct his alleged aggregate mitigation cost estimate, he relies on a preliminary budget estimate for 10 generic hypothetical homes and then extrapolates those narrow estimates to all of the various diverse 2,319 proposed class properties without any consideration of relevant individual characteristics.

Dr. Kram's opinions and testimony do not satisfy the reliability requirements under Rule 702, requiring their exclusion.

1

## II.    BACKGROUND

Pursuant to a Consent Order initially executed in 2002, Union Pacific has been working at the direction of and in collaboration with KDHE to evaluate and remediate an area known as the 29th and Grove Site in Northeast Wichita.   The Site includes trichloroethylene ("TCE") contamination in groundwater associated with property owned by a predecessor company acquired by Union Pacific.   Plaintiffs Faye Black and Jeannine Tolson, on behalf of themselves and a putative class, filed suit alleging that TCE has migrated through groundwater under their homes in Wichita causing alleged damages, including an alleged need to mitigate potential vapor intrusion at homes within the proposed "class area." Plaintiffs have presented through their experts a proposed class area that allegedly comprises 2,319 residential parcels.[1]

Plaintiffs bear the burden to prove that a class should be certified by satisfying all requirements of Rule 23(a) and at least one provision of Rule 23(b).  *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  To certify a class for monetary damages under Rule 23(b)(3), Plaintiffs must demonstrate that "common questions subject to generalized, class[-]wide proof predominate over individual questions." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023).  This evaluation includes whether damages can be established for class members on a class-wide basis.  *See Zapata v. IBP, Inc.*, 167 F.R.D. 147, 166 (D. Kan. 1996) (where computation of damages will require separate mini-trials, individualized damage determination predominates over common issues).

In support of class certification, Plaintiffs offer Dr. Kram and his expert report dated June 13, 2025.  *See* Ex. 6, Expert Report of Dr. Kram ("Kram Rep.").  Dr. Kram's testimony comprises 13 opinions, with 10 of those opinions seemingly related to arguments regarding allegations of

---

[1] Plaintiffs proposed a different class area map in their Amended Complaint.  Dkt. 53, Am. Complaint ¶¶ 75,79.

common risk/injury and remedies/costs for purposes of class certification. Generally, with regard to the asserted common injury, Dr. Kram opines that all proposed class members located over a "plume" developed by Plaintiffs' expert Dr. Laton are subject to the same "threat" of harm from vapor intrusion. And with regard to the asserted common remedy and costs, Dr. Kram opines as to certain costs that he claims must be incurred to preemptively install vapor intrusion mitigation systems at all properties in the proposed class.

## III.    LEGAL STANDARD

In accordance with Rule 702, courts play an important "gatekeeping" role in assessing the admissibility of expert testimony by ensuring that an expert is qualified and that his or her testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In particular, the court must first determine whether a proposed expert is "qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022) (quoting Fed. R. Evid. 702). If so, then the court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

In assessing the reliability of proffered testimony, courts consider several factors, including: "(1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). Where expert testimony is "based on unjustified assumptions," *see Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997), or "stems from nothing but [the expert's] own ipse dixit,"

*Coe v. Cross-Lines Ret. Ctr., Inc.*, No. 22-2047, 2023 WL 3534328, at *7 (D. Kan. May 18, 2023), the testimony fails to meet these standards and must be excluded.  Importantly, the reliability inquiry also considers "whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Roe*, 42 F.4th at 1181.  If there is "simply too great an analytical gap between the data and the opinion proffered," the opinion is inadmissible. *Id*. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## IV.  ARGUMENT

Pursuant to Rule 702, the Court should exclude Dr. Kram's opinions from consideration in the evaluation of Plaintiffs' request for class certification because his opinions are unreliable and will not assist the trier of fact.

First, Dr. Kram's opinions related to the asserted common injury are unreliable for multiple reasons, including because (1) he applies irrelevant EPA default screening levels rather than the Kansas-specific screening levels adopted by KDHE, the agency in charge of the cleanup, (2) he relies on the mapping work of another expert, Dr. Laton, that Dr. Kram did not verify and that does not support the specific common risk opinions offered by Kram, and (3) he proposes "preemptive mitigation" exceeding $500 million in costs (by his estimate) notwithstanding the absence of supporting risk or precedent for the use such a mechanism at comparable sites.

Second, Dr. Kram's opinions regarding a common remedy in the form of projected vapor intrusion mitigation costs also are unreliable because (1) they are based on preliminary and generic cost inputs from other parties that Dr. Kram did not develop or even analyze, (2) the facts and data he relies on were derived from a handful of houses and cannot be reliably extrapolated to all of the 2,319 residential properties in the proposed class area, and (3) the estimates are not representative of actual costs for any individual property because they fail to take into account any differences in

potential remediation approaches and cost drivers among the various homes, townhomes, duplexes, and apartment complexes for which he purports to estimate costs.

>A.    **Dr. Kram's opinions related to risk of potential harm from vapor intrusion for residential properties located above Dr. Laton's plume should be excluded because he applies the wrong standards to insufficient facts.**

Dr. Kram's primary risk opinion is that any home located above groundwater with a measured concentration of 1.2 μg/L of TCE, according to the plume map submitted by Dr. Laton, is "more likely than not" subject to harm from TCE vapor intrusion.  Kram Rep. at 2; *id.* at 66 (Opinion 8).  But that opinion rests entirely on Kram's reference to inapplicable USEPA TCE screening levels instead of the risk screening levels for TCE applied by KDHE, the agency actually overseeing investigation and remediation of the 29th and Grove Site.  Moreover, he applies that incorrect screening level to data provided by Dr. Laton that is not representative of current or individualized TCE concentrations for any specific property.  Given these flaws, Dr. Kram's testimony is not reliable evidence of common risk or harm across the proposed class area.

>1.    **Dr. Kram improperly relies on EPA screening levels to allege potential harm rather than KDHE's screening levels.**

The site assessment and remediation work associated with the contamination at the 29th and Grove Site is under the control and supervision of the KDHE in accordance with the Consent Order entered into between KDHE and UP in 2002 and amended in 2023.  *See* Ex. 13, KDHE 2002 Consent Order; *see also* Ex. 14, KDHE 2023 Amended Consent Order.  Per the Consent Order, all associated groundwater, soil, and indoor air testing and remediation to date has been conducted in cooperation with and by approval of KDHE.  And that testing has been compared to "screening levels" derived from KDHE's official "RSK Manual." *See* Ex. 15, RSK Manual – 6th Version (2021) ("RSK Manual"); Ex. 16, Kansas Vapor Intrusion Guidance (2016), at 16 ("Risk-based screening levels for indoor air under a residential use scenario are presented in KDHE's

RSK Manual."). A "screening" level is used to determine whether additional investigation and testing is required—*i.e.*, it is implemented to rule out homes or areas where the concentration is low enough to not pose any risk.[2] Exceedance of a screening level does not automatically trigger mitigation but rather may result in some further investigation to more specifically define the individualized risk. In contrast, an "action level" is a higher standard that, if exceeded, typically triggers some type of mitigation or other responsive measures. The EPA Office of Solid Waste and Emergency Response (OSWER) guidance, which has been extensively relied upon by Dr. Kram, explicitly acknowledges this distinction. *See* Ex. 17, USEPA, OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air ("OSWER Guidance") at 106 ("Subsurface concentrations of vapor-forming chemicals that exceed the VISL [vapor intrusion screening level] for the respective medium (e.g., groundwater, soil gas, sub-slab soil gas) would not automatically trigger mitigation or subsurface remediation (i.e., they are not offered as response action levels or cleanup levels).").

KDHE has overseen and continues to oversee the 29th and Grove Site's cleanup and KDHE's screening levels have been applied in all testing to determine whether additional investigation is required at the various properties at issue. KDHE has consistently approved testing that uses KDHE's screening levels. For example, in 2009 and 2013, testing was conducted in accordance with KDHE standards with the results—which showed that the vapor intrusion pathway was not complete at the tested locations—approved by KDHE. *See* Ex. 18, Arcadis VI Re-Evaluation Work Plan (Sept. 15, 2023) at 1-5. Additional testing of homes in 2023 and 2024 was also conducted under KDHE supervision and under KDHE standards. *See id.* at 6.

---

[2] *See, e.g.*, US EPA, Regional Screening Levels, https://www.epa.gov/risk/regional-screening-levels-rsls (last accessed Sept. 30, 2025) ("The [risk screening levels] are not cleanup standards and should not be used as cleanup levels.").

Dr. Kram knows that KDHE is the agency overseeing the 29th and Grove Site and that all testing has been conducted in accordance with KDHE standards, and he acknowledged in his deposition that it is typical for the parties at a site where the state agency is overseeing a cleanup to apply the risk screening levels developed by that state agency. *See* Ex. 7, Deposition Transcript of Dr. Kram ("Kram Dep.") 101:5-8 ("The main differences that we see from State to State are based upon what the State tolerance is."). But Dr. Kram disagrees that the KDHE screening levels are appropriate for this litigation. *Id.* at 61:4-5 ("So in this situation, I trust the EPA more than I trust KDHE."). Based on this policy dispute, Dr. Kram ignores the KDHE screening levels and bases his litigation opinion on the separate default EPA screening level for TCE in groundwater of 1.2 μg/L. Dr. Kram then goes further and applies a default "attenuation factor" (which accounts for diminishing concentrations of TCE as it moves through the soil and other barriers) rather than actual testing data and derives a soil gas vapor screening level of approximately 16 μg per cubic meter and an indoor air vapor intrusion screening level of 0.48 μg per cubic meter. Kram Rep. at 2, 37; Kram Dep. 48:25-49:1. Dr. Kram, who lives in California, notes these are the same screening levels used by California regulatory agencies. Kram Dep. 101:16-19.

But Dr. Kram's preferred screening levels are not applicable at this site or in this state or this lawsuit in which Plaintiffs bring Kansas common law and statutory causes of action. The differences between the risk screening levels for KDHE and EPA are:

*Comparison of TCE Screening Levels – EPA default vs. KDHE*

|  | Groundwater (μg/L) | Soil Gas (μg/m$^3$) | Indoor Air (μg/m$^3$) |
|---|---|---|---|
| EPA | 1.19 | 15.9 | 0.48 |
| KDHE | 5.18 | 69.5 | 2.09 |

Because Dr. Kram's risk assertions are not based on the applicable KDHE screening levels, the testimony will not assist the trier of fact in this case and should be excluded. Dr. Kram's opinions relying on EPA screening levels are an attempt to, via this litigation, have a court second-guess the policy of the agency charged with protection of public health in Kansas. Because KDHE standards govern, opinions regarding the EPA screening levels are irrelevant.

Moreover, Dr. Kram's position that the KDHE standard is somehow "wrong" is unreliable because it is based on nothing more than his subjective beliefs and personal policy positions. *Dodge*, 328 F.3d at 1222 (holding that to be reliable, expert testimony must be "based on actual knowledge, not subjective belief or unsupported speculation" (internal quotation marks omitted)). For example, he cites the bare fact that he "trust[s]" the EPA more than KDHE on the issue of the standards. Kram Dep 61:4-5. He further complains that KDHE is "not denying that [the EPA level] exists" but simply failed to adopt the EPA level. *Id.* at 101:13-15. These subjective criticisms do not overcome KDHE's judgment, as the state agency with jurisdiction, to apply its own risk screening levels for evaluation and remediation and for Union Pacific to rely on that determination. And, because he is not a toxicologist, Dr. Kram is not qualified to opine as to the validity of the KDHE levels as to their ability to identify causation or other harm. *See id.* at 62:4-10.

Because Dr. Kram applies the wrong standards without basis, his opinions are unreliable and should be excluded.

### 2. Dr. Kram conflates "screening levels" and "action levels" resulting in exaggerated projections of vapor intrusion risks.

Dr. Kram's treatment of "screening levels" versus "action levels" in his opinion on vapor intrusion risks also renders his opinions unreliable because he overstates the level of risk associated with specific sampling results. Dr. Kram repeatedly asserts that, in testing performed by UP's

consultants under the guidance of KDHE, the parties have "us[ed] an *action* level when they should be using a *risk screening level* for key risk management decisions."  Kram Rep. at 14; Kram Dep. 68:17-19.  This is factually wrong—as noted above, all indoor air testing to-date has been conducted with KDHE risk-screening levels, not action levels.  With this assertion, Dr. Kram is simply arguing that exceedance of his alternative, lower EPA screening levels must trigger mitigation.  But even assuming the EPA levels apply, those EPA levels "are not offered as response action levels or cleanup levels."  Ex. 17, OSWER Guidance at 106.  A screening level does not become an action level merely because Dr. Kram says so, and this erroneous "step" in his analysis "renders [his] analysis unreliable."  *Dodge*, 328 F.3d at 1222.

### 3. Dr. Kram failed to verify or even review Dr. Laton's methodology, and that methodology undermines Dr. Kram's opinions.

The testimonies of Dr. Kram and Dr. Laton regarding the alleged "common" risk are inextricably intertwined.  Dr. Kram provided Dr. Laton with the default EPA groundwater TCE screening level of 1.2 ug/L, which Dr. Laton used to develop a map of "contours" purporting to identify a "plume" representing the areas where the specified TCE level had been detected in groundwater.  In his report, Dr. Kram refers to Dr. Laton's "plume" map as identifying the residences that are "threatened" by TCE vapor intrusion and therefore that comprise the "Wichita Residential Class Area."  Kram Rep. at 66; *id.* at Fig. 6; *see* Kram Dep. 110:12-16 ("Q: So when you say the Wichita residential class area, what do you mean? A: This is defined … as the delineation of the 1.2 microgram per liter [TCE] in groundwater.").  Dr. Kram asserts, based on the Laton plume map, that homeowners who are *currently* "living" in the "Wichita Residential Class Area" defined by Dr. Laton's plume are "more likely than not threatened by toxic chemicals via the vapor intrusion pathway and have been for decades."  Kram Rep. at 66 (Opinion 8).  He further offers an opinion on the number of "residential structures at concentrations of potential

concern" that is derived *entirely* from Dr. Laton's plume mapping.  *See id.* at 36 (Opinion 4); *id.* at Fig. 6.[3]

But Dr. Laton's plume map cannot support these opinions because that map does not provide a picture of the distribution of current contamination.  *See* Ex. 9, Laton Dep. 133:8-12. Indeed, the map doesn't reflect the actual distribution of the contamination at *any* point in time— the map is a mere hodgepodge of historic data, with Dr. Laton mapping the highest concentrations reflected in each groundwater sample taken over the last 30 plus years at each location.[4]  The map is hence of little to no use for evaluating current conditions—for Dr. Kram or anyone else.

Yet Dr. Kram expressly clarified at his deposition that he is offering no independent opinions regarding what TCE groundwater levels exist under any specific home:

> Q: And are you offering opinions on where the 1.2 microgram per liter TCE is in the groundwater?
>
> **A: No. I'm relying on [Dr. Laton].**
>
> Q: Are you offering any opinion on how to contour that plume?
>
> **A: No.**
>
> …

---

[3] Dr. Kram's Opinions 10 and 13 also incorporate Dr. Laton's plume map.  *See* Kram Rep. at 75 (Opinion 10: "Given … the presence of contaminated groundwater above 1.2 ug/L TCE below all homes in the Class Area, preemptive mitigation for all homes in the Class Area is essential to reduce and resolve the long-term vapor intrusion exposure risks."); *id.* at 82 (Opinion 13: "The Defendant should be required to mitigate potential vapor intrusion at all homes within the Wichita Residential Class Area (e.g., those overlying the 1.2 ug/L TCE in groundwater) until groundwater remediation is complete.").

[4] As explained in Union Pacific's contemporaneous motion to exclude the testimony of Dr. Laton, Dr. Laton's approach to developing the contours relied upon by Dr. Kram included the use of historical maximums (using the highest value ever measured in a well or sample between 1991 and 2023 without regard to other testing) and treating "non-detects" (samples where TCE was not detected above the applicable laboratory detection level for the sampling) as affirmative sample results with specific TCE detection values.  *See* Defendant's Motion to Exclude Dr. Laton, *Black v. Union Pacific R.R. Co.,* No. 6:23-cv-1218 (D. Kan. Sep. 30, 2025).  The effect of Dr. Laton's assumptions is to grossly skew the contours to include (1) singular data points that were recorded decades ago and never reoccurred, (2) differences or anomalies in the data that could be explained by factors known to Dr. Laton but not taken into account in the contours, (3) elevated values of TCE where no TCE was in fact detected, (4) values later mitigated by remediation efforts, and (5) TCE testing results that are known to be attributable to other, non-Union Pacific sources. *See generally id.* The result is that Laton's TCE 1.2 µg/L contour adopted by Kram does not reliably reflect present (or even past) groundwater conditions.  *See* Ex. 9, Laton Dep. at 133:8-12 (acknowledging map "is not a snapshot of the TCE contamination at any particular moment in time").

> Q: Are you offering any expert opinion on how to properly or reliably identify where the 1.2 microgram per liter is in the class area?
>
> **A: No. I'm relying on Dr. Laton.**
>
> Q: Are you offering any opinion on the reliability of Dr. Laton's plume map?
>
> **A: I trust Dr. Laton's plume map.**

Kram Dep. 179:2-18. While the basis for this "trust" may arise from Dr. Kram and Dr. Laton working together and providing virtually identical opinions in similar cases for these same counsel, *see id.* at 47:18-21, 82:6-11, that trust cannot be a substitute for Dr. Kram's own due diligence in this case or support from the scientific community. By his own admission, he never read Dr. Laton's report, *id.* at 104:22-23, and he incorporated the Laton plume map figures provided by counsel without discussing them with Dr. Laton, *id.* at 105:2-11. Dr. Kram did not know what methodology Dr. Laton used when Dr. Kram formed his opinions, and testified he likely first heard about Dr. Laton's "historical maximum" approach to the data in a call before his deposition, *id.* at 111:13-23.[5] This type of blind adherence to other experts is grounds for exclusion under Rule 702, especially where, as here, that other expert's work is flawed. *See City of Las Cruces v. Lofts at Alameda, LLC*, 618 F. Supp. 3d 1192, 1196-97 (D.N.M. 2022) (excluding expert based on "lack of independent analysis" and noting that "[c]ourts around the country have held that the rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work").

The fact that Dr. Laton's map does not actually reflect relevant concentrations of groundwater in the proposed class area renders Dr. Kram's opinions related to the existence of common risk and required mitigation that are based on Dr. Laton's map unreliable—and excludable.

---

[5] The specific problems with Dr. Laton's "historical maximum" approach are discussed in n.4, *supra*.

11

### 4. Dr. Kram acknowledged but failed to account for the variability in risk factors among the individual homes in the proposed class area.

Finally, in his opinions related to Dr. Laton's plume and the purported class area, Dr. Kram fails to account for multiple sources of variability that he specifically acknowledged affect the potential for vapor intrusion exposure at individual homes:

- "[T]here's so many other variables that will play into whether or not the [vapor intrusion] pathway exists." Kram Dep. 109:9-11;

- "Q: [Y]ou mentioned the variable about how the HVAC or the furnace system works in a house as something that could affect the pathway, correct? A: Correct." *id.* at 109:12-16; and

- Portions of his Report discuss individualized impacts from "plumbing changes" and "HVAC furnace air intake components located in crawl spaces" on existence of vapor intrusion pathways. Kram Rep. at 11.

Yet, his opinions regarding alleged common risks completely disregard this variability, making only blanket assertions regarding the purported uniform threat to residential properties above the plume drawn by Dr. Laton. Without an examination of the specific variables that he acknowledges, Dr. Kram's opinions that class members share a common risk lack factual basis and are not reliable under Rule 702. *See Roe*, 42 F.4th at 1181.

### B. Dr. Kram's opinion that class-wide "preemptive mitigation" should be required is inconsistent with applicable standards and practices and unsupported by data.

Dr. Kram opines that "preemptive mitigation for all homes in the Class Area is essential to reduce and resolve the long-term vapor intrusion exposure risks." Kram Rep. at 2; *id.* at 75. Without any additional testing to confirm the existence of any harmful vapor intrusion level that would require mitigative action, Dr. Kram opines that it is presently reasonable and prudent to require vapor intrusion mitigation for all 2,319 residential properties that he estimates would cost more than $500 million. *See id.* at 2, 83-85. This opinion is not consistent with recognized practice and applicable screening levels—indeed, he could not identify *any* examples in any state of

12

preemptive mitigation being required or performed at a similarly sized site, Kram Dep. 168:22-169:12. Dr. Kram's mitigation opinion simply does not reflect consideration of sufficient facts and data to be reliable under Rule 702.

              **1.  Dr. Kram's opinions on preemptive mitigation again are not supported by the level of risk demonstrated in testing or by the EPA guidance he relies upon.**

Dr. Kram incorrectly bases his mitigation opinion on EPA screening levels instead of applicable KDHE screening levels and further ignores that both are *screening* levels, not *action* levels. Thus, a measured TCE groundwater concentration of 1.2 ug/L (i.e., in excess of the EPA *screening* level) would not require any immediate mitigation even if EPA standards applied—at most, it would require further investigation. And, regardless of the applicable standard, exceedance of screening levels should not be interpreted as demonstrating proof of actual harm in a tort case. *See Hall v. ConocoPhillips*, 248 F. Supp. 3d 1177, 1186(W.D. Okla. 2017), *aff'd sub nom. Hall v. Conoco Inc.*, 886 F.3d 1308 (10th Cir. 2018) ("Regulatory screening levels, action levels, and standards do not identify real or actual risks to human health. Rather, these regulations are designed to protect the public health by identifying the level of chemical exposure at which there is no threat of harm with a large margin of error." (quoting *Bd. of Cnty. Com'rs of Cnty. of La Plata, Colorado v. Brown Group Retail, Inc.*, 768 F. Supp. 2d 1092, 1105 (D. Colo. 2011)). Dr. Kram's attempt to twist screening levels into indicators of when mitigation is required is simply unsupported.

Moreover, Dr. Kram once again ignores that the mitigation issues are currently being addressed in accordance with KDHE practice. KDHE's standard approach to evaluating the need for mitigation, which it followed at this site, is to identify a subset of the plume area with potentially elevated vapor intrusion risks and then conduct additional testing in that zone to

evaluate the reality of risk.[6]  That approach adequately and properly informs property-specific, risk-based mitigation decisions without the cost and time burdens Dr. Kram suggests.  Indeed, applying the proper KDHE screening level, a group of 24 homes had their indoor air tested in 2023 and 2024 and the sampling showed values in the living spaces that did not exceed the Kansas screening level (with mitigation performed on one home only because a storage cellar had elevated levels).  *See* Ex. 12, Glasrud Deposition Tr. 132:12-25, 210:4-19; *see generally* Ex. 18, Arcadis VI Re-Valuation Work Plan.  Rather than showing enhanced risk that should be addressed through preemptive mitigation, these testing results are consistent with continuing the iterative approach being implemented by Union Pacific with KDHE approval.  Dr. Kram's mitigation approach is thus far afield from what the agency has deemed acceptable in this case and lacks any sort of reliable basis.

In opposing the testing approved by KDHE, Dr. Kram advocates for the implementation of "reasonable maximum exposure" (RME) testing, opining that it is the exclusive acceptable option for testing for vapor intrusion at the homes at issue.  *See* Kram Rep. at 39 ("It is my opinion to a reasonable degree of scientific certainty that every occupied residential building on these 2,319 parcels requires sampling and a thorough evaluation of reasonable maximum exposure (RME).").  In so opining, Dr. Kram misstates EPA guidance documents regarding vapor intrusion testing, including the EPA OSWER guidance he relies upon, which recognizes multiple other sampling options for evaluating vapor intrusion.  *See id.* at 9 (asserting OSWER guidance "recommends determination of the [RME] for all risk-based [vapor intrusion] decisions"); Kram Dep. 77:25-78:3 (discussing OSWER Guidance); Ex. 17, OSWER Guidance at 87-105 (discussing testing

---

[6] Indeed, the KDHE approved a "Vapor Intrusion Re-Evaluation Work-Plan" drafted by UP's consultant Arcadis, in which Arcadis proposed to test an additional 415 homes related to TCE vapor intrusion risk.  *See* Ex. 18, Arcadis VI Re-Evaluation Work Plan.  The work plan was developed in accordance with KDHE vapor intrusion guidance and standards.

approaches).  He further concedes that he cannot identify a single instance in which the RME methodology he advocates for was applied at a large site comparable to this one.  *See* Kram Dep. 134:7-22; 136:1-10.  Indeed, his criticism of the alternative sampling methods appears to be rooted in bias and alleged conspiracy.  He acknowledges that his efforts to get stricter "language implemented" in that guidance were "blocked," *id.* at 78:22-24, and he blames "financial incentive[s]" of consultants for what he sees as faulty and overly lenient guidance.  *Id.* at 79:2-21 ("But on the consulting side, those folks want to protect their job.  They don't want to be the bearer of bad news sometimes, but they also want to balance that with their ability to make more money.").  Dr. Kram's position regarding mandatory application of RME is outside the mainstream, conflicts with EPA's guidance, and is not a reliable basis for discounting the actual sampling data.

### 2. Dr. Kram's mitigation opinion relies on baseless estimates for costs of further testing.

Part of Dr. Kram's opinion rests on a purported comparison of preemptive mitigation costs to costs of further testing, but this asserted comparison was not documented with facts or data. Dr. Kram claims that "[i]n order to do the type of assessment that would be required to make an appropriate evaluation of each of those buildings, it would cost a lot more and take a lot more time and expose people to longer durations of harmful situations than just implementing mitigation for all those homes."  Kram Dep. 83:15-20.  When asked whether the testing would cost more than the $360 million he estimated for post-mitigation monitoring, he admitted he had not even done that analysis. *Id.* at 147:8-15.[7]  This purported comparison is not reliable because it rests on nothing more than Dr. Kram's "back of the envelope assessment of what it would cost to do to the

---

[7] Dr. Kram estimates the costs of mitigation at $360 million "without considering interest."  Kram Rep. at 84.  His interest calculation brings the estimate to over $500 million.  *Id.*

assessment" that he admits is "[n]ot a thorough rigid calculation." *Id.* at 145:8-10. In addition, even his speculative assumptions appear to arise from the unsupported assumption that all houses would require testing, in contrast with the follow up investigation plan for targeted indoor air investigation specifically approved by KDHE. *See* Ex. 18, Arcadis VI Re-Evaluation Work Plan at 7-8. Lacking any basis in fact, this comparison should be excluded as nothing more than *ipse dixit*.

### C.    Kram's cost estimates for vapor intrusion mitigation should be excluded under Rule 702 as unreliable and unsupported by sufficient facts and data.

Plaintiffs also offer Dr. Kram's testimony in a presumed effort to meet their burden to demonstrate a common methodology for assessing an appropriate remedy and associated costs on a class-wide basis.[8] Dr. Kram opines that the costs of preemptive mitigation for all of his proposed class members would total in excess of $500 million, based on generic preliminary cost estimates for a handful of homes that he then extrapolated to every and all types of residential property in the class area. Kram Rep. at 84-88. First, for the reasons discussed above, Dr. Kram's assumption that all residential properties require mitigation is unsupported and unreliable. Second, as discussed further below, Kram's specific cost estimate opinions are unreliable and fail to provide a basis for a class-wide cost methodology because (1) they are based on inputs that Dr. Kram did not develop or even analyze; (2) the facts and data he bases his extrapolation on do not apply to significant portions of the proposed class that Dr. Kram includes in his estimate; and (3) the estimates are not representative of actual costs for any individual property because they fail to take into account any differences in potential remediation approaches and cost drivers among the

---

[8] During direct examination, Dr. Kram testified that he was not offering an opinion on damages. Kram Dep. 172:21-173:3. During redirect by Plaintiffs' counsel, Dr. Kram testified that his opinions did encompass the "appropriate remedy" in this case. *See id.* at 183:8-14.

various houses for which he purports to estimate costs. Dr. Kram's mitigation cost testimony should be excluded under Rule 702.

Dr. Kram cobbled together his baseline estimate primarily from information collected by other persons that he failed to corroborate. His primary source was a generic, single-page mitigation cost preliminary budget prepared by Arcadis, an environmental consultant hired by Union Pacific. This estimate was used by Arcadis for budgeting purposes only and was based on a hypothetical group of 10 generic homes needing mitigation. *See* Kram Dep. 173:24-25 (acknowledging the Arcadis preliminary budget was merely "a projection based on what they might anticipate implementing"). Dr. Kram had no interaction with Arcadis personnel or further background on this document and acknowledged he did not know Arcadis' underlying methodology for the cost estimates. *See id.* at 193:16-18 ("Q: [O]ther than reading the e-mail that those numbers were included[,] you don't have any further insight into what [Arcadis] did in their costing? … A: No. I just read this e-mail, right."). Nevertheless, Kram adopted the Arcadis estimates wholesale. His "lack of independent analysis" renders his opinions unreliable. *See City of Las Cruces*, 618 F. Supp. 3d at 1196.

Nor did Kram do any independent investigation of the properties at issue to inform his opinion. Though Dr. Kram added certain estimated cost inputs to the numbers he pulled from Arcadis, including air purification equipment and power costs, he candidly described those as being estimated "with a little arm waving." Kram Dep. 176:13, *see* Kram Rep. at 85 (Table 2). He did not visit the 29th and Grove Site, review property records for the relevant residences or otherwise gather information about the individual properties. Moreover, despite acknowledging that differences in characteristics of a residential property—which include construction type, age, condition and other factors—can affect the cost of vapor intrusion mitigation at homes, *see* Kram

17

Dep. 109:5-11; *see also* Ex. 4, Hatton Report, at 1 ("Designing an effective vapor intrusion mitigation system (VIMS) will require an extensive investigation of the buildings of concern …."), Dr. Kram did not review that information relevant to mitigation methods and costs here before extrapolating Arcadis' generic estimates for 10 homes to more than 2,300 additional residential properties.  That is not a reliable methodology under Rule 702.

Dr. Kram also references a limited cost estimate prepared by Thomas Hatton of Clean Vapor LLC, another expert designated by Plaintiffs in this case.  *See* Kram Rep. at 86.  Dr. Kram makes clear in his report that he did not use Hatton's numbers in his estimate, *id.*, and noted in his deposition that he simply made a "comparison between the Arcadis estimates and [Hatton's] just to see if they were at least comparable."  Kram Dep. 107:9-11; *id.* at 175:4-7 ("So in the end, the Tom Hatton numbers served as a sort of cross-check.").  However, Dr. Kram's due diligence and verification of the Hatton numbers was similarly lacking and undermines the "cross-check" value. When asked if he knew "specifically how Mr. Hatton reached his conclusions regarding his estimates," *id.* at 174:4-6, Dr. Kram stated he knew "just very basic assumptions" and was not familiar with all of the cost inputs underlying Mr. Hatton's work, *id.* 174:7-14.  In fact, Dr. Kram was provided only with a summary table representing the output of Hatton's estimate.  Kram Rep. at 86.  Dr. Kram admitted that he never read Mr. Hatton's report, either before or after Dr. Kram submitted his own report.  Kram Dep. 192:1-2.

Had Dr. Kram read that report (or Hatton's deposition), he would have seen that Hatton's estimates were based on a cursory review of only two houses (those of the named plaintiffs), that Hatton was directed only to identify a "rough" estimate of costs, and that by Hatton's own description the application of that estimate was not intended to extend to all residential properties but at most to some subset of similarly constructed homes.  *See* Defendant's Motion to Exclude

Expert Testimony of Thomas Hatton, *Black v. Union Pacific R.R. Co.*, No:6:23-cv-1218 (D. Kan. Sep. 30, 2025).  Instead, knowing none of that, Dr. Kram proceeded under the incorrect assumption that Mr. Hatton performed detailed cost estimates applicable to all residential properties and Dr. Kram improperly treated these estimates as supportive of his opinions.

Ultimately then, Dr. Kram (1) adopted wholesale preliminary budget estimates from Arcadis that were intended for a limited purpose; (2) did no diligence on the basis for those estimates or the potential application to homes with different characteristics, except a "cross-check" against "rough" estimates from an expert report he never read and for which he does not know what methodology was used; (3) extrapolated them far beyond the scope of the express limits of those preliminary assessments, (4) with the goal of demonstrating common remedy/mitigation costs applicable to every residential property regardless of age, condition, construction and foundation type, totaling more than $360 million:

*Rough Mitigation Cost Estimates*

| Source | Number of Homes Included in Cost Estimate |
| --- | --- |
| Arcadis | **10 generic hypothetical single-family homes** in proposed class area – no property-specific characteristics identified and no extrapolation to other residences |
| Hatton | **2 homes evaluated**<br><br>Alleged estimate representative of only certain specific types of homes in class area (ranch w/ crawl space and salt box with basement and crawl space)<br><br>Specifically excludes multi-family and other non-like construction |
| Dr. Kram | **Extrapolates to all 2,319 residential buildings in proposed class area**, including multi-family properties and all construction and foundation types |

Dr. Kram's estimates fail to help the Court assess the potential for common mitigation costs because his approach, based on generic home characteristics and unverified preliminary budget estimates, will not produce costs that are representative of actual costs for any individual property.  *See* Kram Dep. 172:21-173:3 ("Q: When you were identifying the costs which you add up in your reports, are you intending to offer an expert report about damages suffered by the class in this case? … A: I don't believe that's my role unless it changes.  I was asked to estimate what it would cost to prevent people from being exposed.").  All of Dr. Kram's mitigation cost estimates should be excluded under Rule 702.

**V.     CONCLUSION**

For these reasons, Defendant Union Pacific Railroad Company respectfully requests that the Court exclude, and not consider, the opinions of Plaintiffs' proposed expert, Dr. Mark Kram, including those reflected in his expert report, in his deposition, or otherwise offered in support of Plaintiffs' anticipated motion for class certification.

Dated: September 30, 2025                    Respectfully submitted,


                                            KNIGHT NICASTRO MACKAY, LLC


                                            By: */s/ Erik H. Nelson                  /*
                                                Erik H. Nelson
                                                Kansas Bar No. 24909
                                                nelson@knightnicastro.com
                                                304 W. 10th Street
                                                Kansas City, MO 64105
                                                (816) 396-0161
                                                (816) 396-6233 (fax)

                                            BAKER BOTTS L.L.P.

                                                Kevin T. Jacobs (lead attorney)
                                                Texas Bar No. 24012893
                                                kevin.jacobs@bakerbotts.com
                                                Hannah Roskey

20

Texas Bar No. 24118237
hannah.roskey@bakerbotts.com
910 Louisiana Street
Houston, Texas 77002
(713) 229-1947
(713) 229-7847 (fax)

Kent Mayo (lead attorney)
Washington, D.C. Bar No. 452842
kent.mayo@bakerbotts.com
Martha Thomsen
Washington, D.C. Bar No. 1016402
martha.thomsen@bakerbotts.com
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700
(202) 639-7890 (fax)

SHOOK, HARDY & BACON LLP

Robert R. Simpson
Connecticut Bar No. 409048
rsimpson@shb.com
City Place I
Hartford, CT 06103
(850) 515-8901
(850) 515-8911 (fax)

***Attorneys for Defendant***
***Union Pacific Railroad Company***

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 30th day of September, 2025, I caused a copy of the foregoing to be served upon all parties via email.

*/s/ Erik H. Nelson*
Erik H. Nelson
