**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

FAYE BLACK, et. al,

                Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

                Defendant.

Case No. 6:23-cv-1218-EFM-ADM

(Oral Argument Requested)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE EXPERT**
**TESTIMONY OF DR. W. RICHARD LATON**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

III.    LEGAL STANDARD ......................................................................................... 4

IV.     ARGUMENT ...................................................................................................... 6

      A.      Dr. Laton misused groundwater data results such that his contours do not accurately reflect actual or present groundwater conditions, and his opinions are therefore both unreliable and unhelpful to the trier of fact. ................................... 9

            1.      Dr. Laton mapped the highest TCE test result from each well to draw his contours. ................................................................................................. 9

            2.      Dr. Laton took no steps to adjust potentially misleading testing data. ..... 10

            3.      Dr. Laton ignores other known sources of TCE. ..................................... 11

            4.      Dr. Laton treated all non-detect test results as having a detected TCE value of half the detection limit. ...................................................................... 12

      B.      Dr. Laton does not attempt to draw any connection between the groundwater contamination and alleged vapor intrusion risks or mitigation. ........................... 14

V.      CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brayman v. KeyPoint Gov't Sols., Inc.*,
83 F.4th 823 (10th Cir. 2023) ...................................................................................6

*Cochrane v. Schneider Nat'l Carriers, Inc.*,
980 F. Supp. 374 (D. Kan. 1997) ..............................................................................5

*Coe v. Cross-Lines Retirement Center, Inc.*,
Case No. 22-2047-EFM, 2023 WL 3534328 (D. Kan., May 18, 2023) .............5, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................................................................................................4, 5

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) .............................................................................5, 7

*Eatinger v. BP America Production Co.*,
271 F.R.D. 253 (D. Kan. 2010)................................................................................6

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136, 118 S.Ct. 512 (1997)...................................................................5, 7, 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..................................................................................................6

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
No. 17-md-2785-DDC-TJJ, 2019 WL 1569294 (D. Kan. Apr. 11, 2019)................5

*Naylor Farms, Inc. v. Chaparral Energy, LLC*,
923 F.3d 779 (10th Cir. 2019)..................................................................................6

*Roe v. FCA US LLC*,
42 F.4th 1175 (10th Cir. 2022) .....................................................................4, 5, 7, 14

*Tudor v. Se. Okla. State Univ.*,
13 F.4th 1019 (10th Cir. 2021) ................................................................................4

*United States v. Nacchio*,
555 F.3d 1234 (10th Cir. 2009) .............................................................................4, 6

*United States v. Rodriguez-Felix*,
450 F.3d 1117 (10th Cir. 2006)................................................................................4

**OTHER AUTHORITIES**

Federal Rule of Evidence 702...................................................................................................5

## I.    INTRODUCTION

Defendant Union Pacific Railroad Company ("Union Pacific") submits this memorandum pursuant to Federal Rule of Evidence 702 in support of its motion to exclude any testimony from Plaintiffs' designated expert, Dr. W. Richard Laton, during the class certification phase of this proceeding.

Plaintiffs seek class certification to recover alleged damages associated with potential vapor intrusion from trichloroethylene ("TCE") in groundwater beneath residential properties in Wichita.  The proposed class area, however, continues to change.  Plaintiffs proposed one class area map in their Amended Complaint.  Dkt. 54, Amended Complaint ("Compl."), ¶ 75.  Dr. Laton proposes another: the primary content of his expert report are two contours that purport to delineate TCE concentrations of 1.2 micrograms per liter ("µg/L") and 5.0 µg/L in groundwater (the "TCE 1.2 µg/L Contour" and "TCE 5 µg/L Contour," respectively).  Another of Plaintiffs' proposed experts, Mr. Frank Anastasi, opined that Dr. Laton's TCE 1.2 µg/L Contour is the appropriate "class area" for this matter; Plaintiffs' expert Dr. Mark Kram likewise opined that vapor intrusion mitigation is needed wherever TCE concentrations are present above 1.2 µg/L in groundwater as mapped by Dr. Laton.  Ex. 2, Expert Report of Frank S. Anastasi dated June 12, 2025 ("Anastasi Rep.") at 15; Ex. 6, Expert Report of Dr. Mark Kram dated June 13, 2025 ("Kram Rep.") at 2.

Dr. Laton's report and opinions should be excluded.  Specifically, Dr. Laton's opinions (1) are not reliable because his methodology to map TCE groundwater contamination is deeply flawed and significantly misrepresents groundwater conditions and (2) are not relevant or helpful to the trier of fact because, by his own admission, his mapping does not reflect current groundwater conditions and further does not inform the presence of the indoor air risks alleged by Plaintiffs on an individual or class-wide basis.

## II.    BACKGROUND

Plaintiffs Faye Black and Jeannine Tolson, on behalf of themselves and a putative class, allege that contamination associated with property now owned by Union Pacific has migrated under their homes in Wichita causing alleged damages.  Plaintiffs claim that constituents disposed of at the Site migrated with the groundwater to their properties and other properties within the putative class area through "vapor intrusion."  Compl., ¶¶ 2, 6, 12-13, 24.  As alleged in the Amended Complaint, "[v]apor intrusion occurs when chemical vapors from VOCs migrate upward from contaminated soil and/or groundwater through the soil and through building foundations and floors and into the indoor air," which Plaintiffs assert resulted in damages, including property damage, diminution in property value, stigma, economic and non-economic losses, exposure to toxic substances, and endangerment to health.  *Id.*, ¶¶ 24-26, 81, 105, 109-110, 118, 131.

Plaintiffs seek to certify a class comprising "[a]ny and all persons that own any residential real property as of September 8, 2022 in the area of Northeast Wichita" within a defined "[c]lass [a]rea."  *Id.*, ¶ 75.  In the Amended Complaint, Plaintiffs identified this proposed class area (the "Complaint Class Area") in a figure and outlined in red.  *Id.*

Plaintiffs offer Dr. Laton primarily to characterize the scope, source, and extent of TCE groundwater contamination; specifically, "delineation of the historical extents of the 1.2 µg/L and 5.0 µg/L Isoconcentration Contours" and the residential parcels within the two "plume" areas.  Ex. 8, Expert Report of W. Richard Laton dated June 13, 2025 ("Rep.") at 7.  Dr. Laton's proposed contours and supporting data are attached to his report as Figures 22-24 and Appendix C.  Rep. at Figures 22-24, Appendix C: Chemical Sampling Database.  Figure 24, which illustrates the two contours and intersecting residential parcels, is reproduced in relevant parts below:



Dr. Laton readily admitted in deposition that he utilized the 1.2 µg/L threshold at the direction of Dr. Kram and had no independent basis for its selection:

> Q. Why did you select 1.2 micrograms per liter of TCE as a concentration to delineate?
> A. That was provided to me by Dr. Kram as a lower limit for what he wanted mapped.
> …

3

Q.· ·Do you have any independent basis for selecting that 1.2 number?
MR. ELLIS: Objection: Form.
THE WITNESS: It was outside my scope for this particular project.

*See* Ex. 9, Deposition of Richard Laton ("Laton Dep.") at 14:19-15:14.

Further, Dr. Laton himself undertook no independent evaluation of whether his contours represent an appropriate "class area." Laton Dep. at 23:9-15. Notably, the TCE 1.2 µg/L Contour varies significantly from the proposed Complaint Class Area.

Dr. Laton likewise does not opine on the reasonableness or adequacy of investigations at the Site, whether further groundwater remedial measures are necessary at the Site, whether or not there is a vapor intrusion pathway for TCE from groundwater at the Site, or whether the TCE 1.2 µg/L Contour corresponds to vapor intrusion risk at overlying residences. Laton Dep. at 17:11-18:14. He did not undertake a groundwater to indoor air pathway analysis and presents no opinion on the need for, or potential cost of, vapor intrusion mitigation measures. Laton Dep. at 19:3-25.

## III.    LEGAL STANDARD

In accordance with Federal Rule of Evidence 702, courts play an important "gatekeeping role" in assessing the admissibility of expert testimony by ensuring that an expert is qualified and that their testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). In particular, the court must first determine whether a proposed expert is "qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021). If so, then the court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).

.

4

In assessing the reliability of proffered testimony, courts consider several factors, including: "(1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting Fed. R. Evid. 702). Where expert testimony is "based on unjustified assumptions," *see Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997), or "stems from nothing but [the expert's] own ipse dixit," *Coe v. Cross-Lines Retirement Center, Inc.*, Case No. 22-2047-EFM, 2023 WL 3534328, at *7 (D. Kan., May 18, 2023), the testimony fails to meet these standards and must be excluded. Importantly, the reliability inquiry also requires the court to ask "whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Roe*, 42 F.4th at 1181. If there is "simply too great an analytical gap between the data and the opinion proffered," the opinion is inadmissible. *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997)).

This court has found that a *Daubert* analysis may be necessary when plaintiffs rely on that expert's opinion to certify a class under Fed. R. Civ. Proc. 23. *See, e.g., Coe*, 2023 WL 3534328, at *3. "[T]he role and scope of the *Daubert* analysis increases in step with the importance of the expert opinion to plaintiff's showing of Rule 23(a)'s requirements." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2019 WL 1569294 at *3 (D. Kan. Apr. 11, 2019). Greater scrutiny is required where "a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for certification[.]" *Id.*

## IV.    ARGUMENT

The Court should exclude Dr. Laton's opinions from consideration in evaluating class certification because they are neither reliable nor relevant.  Plaintiffs bear the burden to prove that a class should be certified by satisfying all requirements of Rule 23(a) and at least one provision of Rule 23(b).  *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  Part of the class certification inquiry under Rule 23(a) is whether "the representative plaintiff[s] possess the same interests and suffer the same injuries as the proposed class members."  *Eatinger v. BP America Production Co.*, 271 F.R.D. 253, 259-60 (D. Kan. 2010).  In addition, to certify a class for monetary damages under Rule 23(b)(3), Plaintiffs must demonstrate that "common questions subject to generalized, class[-]wide proof predominate over individual questions."  *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023) (quoting *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019)).

The exact parameters of the Plaintiffs' proposed "class area" remain unclear.  Although Plaintiffs originally proposed the Complaint Class Area, they appear to have engaged Dr. Laton to re-draw the proposed class area by mapping two contours of TCE concentrations in groundwater and identifying the residential parcels within each.  Rep. at 7.  Although Dr. Laton himself expressed no opinion on the class area, Mr. Anastasi and Dr. Kram opined that the TCE 1.2 µg/L Contour represents the new boundaries of the proposed class.  Given that Dr. Laton's contours go to the root of defining the alleged class area and identifying the alleged putative class members, his testimony is subject to close scrutiny for reliability and relevance.  *Nacchio*, 555 F.3d at 1241.

Dr. Laton's testimony cannot survive this inquiry.  As an initial matter and as noted in Section II, *supra*, Dr. Laton relies entirely on Dr. Kram for his selection of the 1.2 µg/L threshold and was unable to identify any independent basis for that threshold.[1]

Further, Dr. Laton's methodology for developing both contours falls far short of the requisite standard for reliability.  In assessing reliability, the court evaluates whether the proffered theory is accepted in the scientific community.  *Dodge*, 328 F.3d at 1222.  Expert testimony must be based on sufficient data, sound methods, and the facts of the case and will be excluded if there is "simply too great an analytical gap between the data and the opinion proffered."  *Roe*, 42 F.4th at 1181 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997)).  Here, Dr. Laton's contours are based on unsound methods that grossly misrepresent present groundwater conditions, rendering his opinions unreliable and his contours unusable for purposes of demonstrating commonality, typicality, and predominance among the proposed class.  Among other flaws, Dr. Laton used the highest historical TCE testing results since 1991 for mapping purposes, did not account for improvements in TCE concentrations over time, and treated "non-detect" values as if they had registered the presence of TCE in groundwater.  The flaws in his methodology, and impact of those flaws, can be summarized as follows:

| Flaws in Contour Assumptions | Impact on Reliability and Relevance |
| --- | --- |
| Dr. Laton reviewed testing data dating back to 1991 and **chose to rely on the highest TCE test result from each well** to draw his contours.  *See infra* section IV.A.1. | By relying on "historic maximums," Dr. Laton's contours do not show present, or even recent, TCE levels.  This approach pulls in singular data points recorded years ago and that never reoccurred and are not reflective of current conditions.  This approach also masks the impact of groundwater remediation activities. |

---

[1] Defendant is contemporaneously filing a motion to exclude Dr. Kram's testimony regarding application of the 1.2 µg/L threshold.

| Flaws in Contour Assumptions | Impact on Reliability and Relevance |
|---|---|
| Dr. Laton **did not adjust testing data to take into account known differentiating factors**, such as well depth. *See infra* section IV.A.2. | Despite using historic maximum sampling results, Dr. Laton did not undertake any additional evaluation to distinguish the weight and impact of sampling results – for instance, sampling results from deeper wells. This approach misrepresents actual TCE groundwater concentrations at shallower depths closer to the surface. |
| Dr. Laton's contours **take into account all available TCE test results** without flagging results that likely originate from other, non-Union Pacific sources, even though he was aware of such sources. *See infra* section IV.A.3. | Including all TCE testing values has the effect of artificially enlarging the contours to the west (towards the industrial corridor) and to the southeast (towards the dry cleaners) by attributing TCE contamination from other sources to Union Pacific. |
| Dr. Laton treated **all non-detect test results as having a detected TCE value of half the detection limit.** *See infra* section IV.A.4. | Dr. Laton's practice of assigning elevated TCE levels to non-detect results artificially enlarges the contours by pulling in areas that never had detections of TCE. |

As a result of these methodological flaws, Dr. Laton's contours are both unreliable and irrelevant. Finally, Dr. Laton's contours are only offered to delineate (inaccurately) TCE in *groundwater*; he does not undertake any class-wide assessment of TCE in *indoor air*.[2] Accordingly, Dr. Laton's opinions have little bearing on class certification and must be excluded.[3]

---

[2] Dr. Laton's new contour mapping actually demonstrates that one of the named Plaintiffs (Ms. Tolson) could not be representative of the class because her property is located *outside* the two contours as drawn by Dr. Laton. Rep. at Figure 24; *see also* Laton Dep. at 100:6-11.

[3] Beyond Dr. Laton's contours and identification of alleged impacted properties, his remaining opinions are entirely irrelevant to class certification. Although he devotes a significant portion of his report to detailing Site conditions and history and makes broad proclamations regarding the vapor intrusion risk to properties located above his contours, he is clear that these subjects are outside the scope of his opinions. Laton Dep. at 17:16-18:4, 19:3-25. As such, these portions of his report and testimony are of no use to the trier of fact and should also be excluded as irrelevant.

A.    **Dr. Laton misused groundwater data results such that his contours do not accurately reflect actual or present groundwater conditions, and his opinions are therefore both unreliable and unhelpful to the trier of fact.**

Dr. Laton only opines in this case on the location and extent of TCE in groundwater. Despite this narrow scope, Dr. Laton's mapping of both TCE contours grossly mispresents groundwater conditions and the presence of TCE in groundwater. Specifically, Dr. Laton drew his contours much more expansively than either the TCE groundwater sampling results or present conditions supports, rendering the contours unreliable and unusable. In fact, Dr. Laton admitted in his deposition that his contours are "not a snapshot of the TCE contamination at any particular moment in time," including the present. Laton Dep. at 133:8-12, 134:14-25.

1.    **Dr. Laton mapped the highest TCE test result from each well to draw his contours.**

First, to prepare his contours, Dr. Laton relied on "historic maximums"—meaning that he reviewed well sampling data dated as early as 1991 and took the maximum historic concentration of TCE from each well, regardless of the date the value was recorded and without regard for any prior or subsequent testing. Using this approach, if a well detected TCE above 5 µg/L in 1991 but did not detect TCE again, Dr. Laton included that well in both his TCE 1.2 µg/L and TCE 5 µg/L Contours and did not weigh data any differently based on its age or subsequent samples that showed lower or no concentrations of TCE. Dep. at 87:17-88:5.

At his deposition, Dr. Laton justified his method on the basis that "you have to look at all the data in order to have any idea or picture [or] understanding of what's going on, what has been going on and what [is] most likely will happen as it moves forward." Laton Dep. at 51:8-11. His approach, however, does not accomplish this goal. By relying on only the highest values, Dr. Laton mixes—at random—data from discrete sampling events from over thirty years. His

approach succeeds in enlarging the contours, but it is at the expense of showing any clear picture of past, present, or future contamination.

When asked, Dr. Laton was unable to point to any guidance or industry practice to justify his use of maximum historic concentrations. He commented that "[c]ertainly it's commonplace," he has "seen it on other reports," he has "done it for decades," and "it's done all the time," but he could not identify any actual external support for this position aside from his own insistence that this practice is appropriate and common. Laton Dep. at 88:15-20. Lacking any foundation or basis, Dr. Laton's contours and underlying methodology should be excluded as inadmissible *ipse dixit*. *Coe v. Cross-Lines Retirement Center, Inc.*, 2023 WL 3534328, at *7 (D. Kan., 2023).

Further, by using only historical maximums, Dr. Laton completely ignores the impact of groundwater remediation activities. As Dr. Laton acknowledged in his report, "[t]here have been several remedial activities conducted since 2005 on- and off-Site" that resulted in declining TCE concentrations. Rep. at 10, 20-22. Even if remedial activities lowered TCE concentrations in a given area (as the remedial measures were designed to do), Dr. Laton would still rely on pre-remediation detections in drawing his contours for purposes of this litigation. Dep. at 116:6-15. Plaintiffs' own expert, Mr. Anastasi, acknowledged in his deposition that Dr. Laton's use of historical maximums would mask the impact of any groundwater remediation activities. Ex. 3, Deposition of Frank Anastasi ("Anastasi Dep.") at 138:19-139:8.

### 2. Dr. Laton took no steps to adjust potentially misleading testing data.

Second, Dr. Laton failed to correct misleading data even when he was aware of those risks of error. Specifically, he did not account for well depth in his contours and "used all the data that was available to [him] regardless of depth." Laton Dep. at 81:15-16. Deeper wells are further from the ground surface and generally have a more attenuated connection to above-ground risks like vapor intrusion than shallower wells. Anastasi Dep. at 146:1-9, 163:2-6. Further, Plaintiffs'

expert Mr. Anastasi commented that a deep well typically "has much more TCE than the shallow well." Anastasi Dep. at 163:2-6. Dr. Laton also admitted during his deposition that it is possible to get different TCE concentration results from the same location if samples are taken at different depths. Laton Dep. at 89:24-90:4. Dr. Laton further acknowledged that, if presented with a non-detect result from a shallower well with a more direct surface connection and a 5 µg/L result from a deeper well with a more attenuated connection, he would still use the 5 µg/L result to develop his contours because he "use[d] the maximum concentration of that location" regardless of depth. Laton Dep. at 90:5-18. In other words, he would have used the sampling result with the higher concentration even if sampling results at shallower depths indicated a lack of TCE near the surface.

### 3. Dr. Laton ignores other known sources of TCE.

Third, Dr. Laton was aware of and has acknowledged that other sources of contaminants in the groundwater existed in the vicinity of Plaintiffs' "class area" but failed to account for those in his contouring. In his deposition, he noted that he "looked at both dry cleaners, [] at the northern industrial corridor . . . [and] other sites out there that had some gasoline in them" and "tried to get as much data from as many different sources and as many different places" as he could. Laton Dep. at 76:20-24. However, Dr. Laton stopped short of incorporating these sources in his analysis or mapping. When asked whether he excluded any data if it could have been attributable to another source, Dr. Laton confirmed that he "did not exclude anything" and "used all the data, regardless." Laton Dep. at 77:9-10, 134:21-23. He also makes no indication in his report or on his maps when recorded TCE values could be attributable to other sources, which misleadingly and incorrectly results in any recorded values of TCE referenced in his opinions as ascribed to Union Pacific with no attribution to these other sources of contaminants.

11

4.      **Dr. Laton treated all non-detect test results as having a detected TCE value of half the detection limit.**

Last, and perhaps most significantly, Dr. Laton treated non-detect values in a manner that was not explained in his report and significantly skews the data to enlarge his contours. A "non-detect" result means that TCE was not detected in a given sample above the laboratory reporting limit for that sample. Laboratory reporting limits can vary; within the groundwater sampling data set reviewed by Dr. Laton, some reporting limits exceeded 1.2 µg/L (or 5 µg/L) while others were less than 1.2 µg/L. As Dr. Laton explained at his deposition, when drawing his contours, he assigned any non-detect values as half the detection limit. Laton Dep. at 91:21-22. In practice, this meant that for a "non-detect of less than five, meaning the [detection limit] concentration is less than five and there is no such thing as zero," he would "take half of that detection limit [or 2.5 µg/L] for mapping purposes." Laton Dep. at 91:19-22. Following his logic, if a well sample with a detection limit of 5 µg/L recorded a non-detect value for TCE in 1991, Dr. Laton would have plotted that sample on both his 1.2 µg/L and 5 µg/L contours as if that well sample had recorded a value of 2.5 µg/L of TCE in the present day, regardless of any subsequent data from the well.

Figure 22, attached to Dr. Laton's report and excerpted below, shows a visual depiction of the groundwater sampling data that Dr. Laton relied on to draw his contours. Rep. at Figure 22.[4]

---

[4] The legend for Figure 22, reproduced below, includes the date "2025_06_07." This is not the date that the sampling data was collected but appears to be a reference to the date of his dataset. As Dr. Laton confirmed several times during his deposition, he used the highest sampling values from all of the data available to him, dating back to as early as 1991. *See e.g.*, Laton Dep. at 79:5-6, 91:19-22, 134:21-23. These historical maximums are the data points reflected in his Figure 22.



This data represents both the maximum historical TCE groundwater contamination as well as the highest detection limits in areas where no TCE was actually detected. Dep. at 91:19-22. As shown clearly in Figure 22, there are several areas within Dr. Laton's TCE 1.2 µg/L Contour that contained only non-detect sampling results (represented in the figure above by squares rather than circles). As one example, there is an area north of Murdock where Dr. Laton's approach artificially

extended the TCE 1.2 µg/L Contour to include wells with detection limits between 1 and 5 µg/L *but no actual TCE was ever detected*.  Dep. at 105:23-106:4.  Dr. Laton justified this practice on the basis that "[t]he only way to map the non-detects is you have to set a value to them" but did not provide any scientific support for his using half the detection limit as that value in this litigation.  Laton Dep at 103:16-17.  Other examples of this same flawed approach can be found in Dr. Laton's testing data.  For instance, MW-UP-17D, which is located on East 14th Street between N. Grove and N. Poplar Avenues, has recorded *only* non-detect and <1 µg/L values for TCE but is plotted along the eastern edge of the TCE 1.2 µg/L Contour because it was assigned multiple TCE values based on the detection limit alone (and not actual sampling results).  Rep. at Appendix C.  These are clear instances of where there is "simply too great an analytical gap between the data and the opinion proffered" for Dr. Laton's expert report to be admissible.  *Roe*, 42 F.4th at 1181(quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997)).

In sum, Dr. Laton's approach is unreliable, not supported in the guidance, and not helpful to the trier of fact.  The effect of his assumptions is to skew the contours to include (1) singular data points that were recorded decades ago and never reoccurred, (2) differences or anomalies in the data that could be explained by factors known to Dr. Laton but not taken into account in the contours, (3) elevated values of TCE where no TCE was in fact detected, (4) values that were later mitigated by remediation efforts, and (5) testing results that are known to be attributable to other, non-Union Pacific sources.  The result is that the TCE 1.2 µg/L and TCE 5 µg/L Contours do not reflect present (or even past) groundwater conditions.

### B.    Dr. Laton does not attempt to draw any connection between the groundwater contamination and alleged vapor intrusion risks or mitigation.

Dr. Laton's opinions are unhelpful to the trier of fact and irrelevant to class certification because he makes no assessment of how the indoor air at each property within his contours could,

or would, be impacted. Dr. Laton acknowledged in his deposition that he did not undertake any groundwater to indoor air pathway or risk analysis, and he offers no opinion on whether mitigation measures are required at properties located within his contours. Laton Dep. at 19:3-25. Indeed, Plaintiffs' expert Mr. Anastasi acknowledged at his deposition that there are a number of factors— beyond groundwater TCE concentration—that would impact actual vapor intrusion and presence of TCE in indoor air. Anastasi Dep. at 161:1-163:19. Even if Dr. Laton's mapping were accurate and reflected present day conditions, his TCE 1.2 µg/L Contour still would not represent an area with uniform indoor air risks because it does not account for differences in hydrogeology, soil conditions, or other variable conditions across the Site.

Dr. Laton's opinion is therefore not relevant because it will not assist the trier of fact in determining whether there are any common issues among the proposed class members.

## V.    CONCLUSION

For these reasons, Union Pacific respectfully requests that the Court exclude, and not consider, the opinions of Plaintiffs' proposed expert, Dr. W. Richard Laton, including those reflected in his expert report, in his deposition, or otherwise offered in support of Plaintiffs' anticipated motion for class certification.

Dated: September 30, 2025                    Respectfully submitted,


                                             KNIGHT NICASTRO MACKAY, LLC


                                             By: */s/ Erik H. Nelson*
                                                 Erik H. Nelson
                                                 Kansas Bar No. 24909
                                                 nelson@knightnicastro.com
                                                 304 W. 10th Street
                                                 Kansas City, MO 64105
                                                 (816) 396-0161
                                                 (816) 396-6233 (fax)

BAKER BOTTS L.L.P.

Kevin T. Jacobs (lead attorney)
Texas Bar No. 24012893
kevin.jacobs@bakerbotts.com
Hannah Roskey
Texas Bar No. 24118237
hannah.roskey@bakerbotts.com
910 Louisiana Street
Houston, Texas 77002
(713) 229-1947
(713) 229-7847 (fax)

Kent Mayo (lead attorney)
Washington, D.C. Bar No. 452842
kent.mayo@bakerbotts.com
Martha Thomsen
Washington, D.C. Bar No. 1016402
martha.thomsen@bakerbotts.com
700 K Street, N.W.
Washington, D.C. 20001
(202) 639-7700
(202) 639-7890 (fax)

SHOOK, HARDY & BACON LLP

Robert R. Simpson
Connecticut Bar No. 409048
rsimpson@shb.com
City Place I
Hartford, CT 06103
(850) 515-8901
(850) 515-8911 (fax)

***Attorneys for Defendant***
***Union Pacific Railroad Company***

## **CERTIFICATE OF SERVICE**

This is to certify that on this 30th day of September, 2025, I caused a copy of the foregoing to be served upon all parties via email.

/s/ Erik H. Nelson
Erik H. Nelson

17