**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

FAYE BLACK et al.,

*Plaintiffs,*

v.

Case No. 23-1218-EFM-ADM

UNION PACIFIC RAILROAD COMPANY,

*Defendant.*

**MEMORANDUM AND ORDER**

In this Order, the Court considers two motions filed by Defendant Union Pacific Railroad Company ("Union Pacific"). Both motions arose in the context of Plaintiff Faye Black's effort to certify a class for her claims that Union Pacific is responsible for toxic chemical contamination underneath homes within Plaintiff's proposed class area ("PCA").

The first Motion the Court will address is Union Pacific's Federal Rule of Procedure 12(b)(1) Motion to Dismiss Plaintiff's claims for lack of standing (Doc. 218). Union Pacific argues that Plaintiff's injury in fact is too speculative and disconnected from her requested remedy to confer Article III standing upon her and the potential class members. The second is Union Pacific's Motion to Exclude Expert Testimony (Doc. 185). In that Motion, Union Pacific seeks to exclude Plaintiff's five experts who offer testimony and reports in support of her effort to certify a class action. For the reasons stated herein, the Court denies Union Pacific's Motion to Dismiss and grants in part and denies in part its Motion to Exclude.

## I.     Factual and Procedural Background

Plaintiff brings this putative class action alleging that Union Pacific contaminated her property, exposing her and others similarly situated to toxic chemicals. Union Pacific owns and operates an industrial railroad site near 29th North and Grove Streets in Wichita, Kansas (the "Site"). In 1994, the City of Wichita discovered trichloroethylene ("TCE")[1] contamination in the groundwater near 21st North and Grove Streets. In 1995, the Kansas Department of Health and Environment ("KDHE") began investigating the TCE contamination, eventually confirming that Union Pacific's Site was the source of the contamination.

In 2002, Union Pacific entered a consent order with KDHE to investigate the contamination. In 2003, KDHE and Union Pacific learned that the groundwater contamination plume extended 2.7 miles south of the Site. Pursuant to the consent order, and overseen by KDHE, Union Pacific has engaged in investigations, studies, and remediation measures since at least 2005.

In September 2022, KDHE held its first public meeting to inform the community in Northeast Wichita about the contamination and public health risks. Plaintiff filed suit in October 2023 and seeks to certify a class of persons who own residential homes within an area overlying TCE-contaminated groundwater. After Plaintiff filed an Amended Complaint and Union Pacific filed a partial motion to dismiss, only four of Plaintiff's claims remain: negligent remediation, continuing nuisance, continuing trespass, and violation of Kansas's Discharge Statute, K.S.A. § 65-6203.

Plaintiff contends that the TCE contamination in the groundwater and soil beneath the PCA homes will volatize into vapor and enter the indoor air of the PCA homes via a process called vapor intrusion. Plaintiff maintains that this poses a health risk to her and the potential class

---

[1] TCE is chemical that has been commonly used as an industrial degreaser. It is a known carcinogen.

members. Accordingly, Plaintiff requests damages measured, in large part, by the cost of installing vapor intrusion mitigation systems within the PCA homes. Plaintiff designated five experts to support her claims:

**Dr. Richard Laton:** Dr. Laton is a hydrologist, hydrogeologist, and environmental contamination expert. He used historic groundwater sampling data from tests conducted by Union Pacific and KDHE to map where the TCE groundwater contamination exceeds a value of 1.2 micrograms per liter ($\mu g/L$). Dr. Laton's plume map defines Plaintiff's proposed class area ("PCA").

**Mr. Frank Anastasi:** Mr. Anastasi is a hydrogeologist and offers opinions about the location of the TCE contamination from the Site. Additionally, he opines that Union Pacific's remediation measures have been negligent since 2003.

**Dr. Mark Kram:** Dr. Kram is a hydrogeochemist. He offers an opinion that connects the TCE groundwater contamination value of 1.2 $\mu g/L$ to a risk of TCE vapor intrusion into the overlying homes at a value of 0.48 micrograms per cubic meter ($\mu g/m^3$). Based upon this risk, he opines that vapor intrusion mitigation systems should be installed at every home that overlies TCE groundwater contamination of 1.2 $\mu g/L$.

**Mr. Thomas Hatton:** Mr. Hatton is a technical expert in the field of vapor intrusion mitigation. He offers cost estimates for installing vapor intrusion mitigation systems within two types of homes he identified in the PCA: single-family, single-story ranch homes and single-family, two-story residences.

**Dr. Richard Zabel:** Dr. Zabel is an urban and real estate economist. He offers a formula for determining the current market value of the properties within the PCA.

On September 30, 2025, Union Pacific filed its Motion to Exclude each of Plaintiff's experts from the Court's consideration of the issue of class certification.

Union Pacific first raised the issue of standing in its memorandum opposing class certification. In her Amended Complaint, Plaintiff specifically requested judgment "for the loss of permanent and temporary or continuing property value, stigma, unjust enrichment, [and] the cost of prompt corrective action" to relieve the alleged injury to her and the potential class members.[2] In her Motion to a Certify Class, however, Plaintiff did not seek class treatment of her request for diminution in value damages.[3] Union Pacific argued that, without a diminution in value claim, Plaintiff lacks standing.

On April 23–24, the Court held a hearing to address Union Pacific's Motion to Exclude and Plaintiff's Motion to Certify Class. The Court heard Union Pacific's standing argument but noted that Union Pacific had not made a motion to that end. The Court invited Union Pacific to file a Rule 12(b)(1) motion after the hearing; Union Pacific did on May 4, 2026. Plaintiff filed her response on May 14, 2026. Because the Court heard much of the arguments at the hearing, the Court did not grant Union Pacific an opportunity to file a reply specific to the Motion to Dismiss. Accordingly, the matters are fully briefed and ripe for the Court's ruling.

---

[2] Doc. 54 at 31.

[3] *See* Doc. 186 at 46 (only listing property mitigation damages as appropriate for class-wide determination); *see also* Doc. 202 at 13 (noting in her reply that "Plaintiff and the class do not seek a decrease in property value at all, much less a decrease in valued due to the presence of indoor air exceedances.").

## II.    Legal Standards

### A.    Federal Rule of Civil Procedure 12(b)(1) and Standing

Under Rule 12(b)(1), a defendant may move to dismiss a claim for lack of subject-matter jurisdiction.[4] Federal courts are courts of limited jurisdiction, and a presumption exists against exercising jurisdiction over a case.[5] The party asserting jurisdiction bears the burden of establishing its existence.[6] Thus, the Court may exercise jurisdiction only when specifically authorized to do so and must dismiss a claim if it becomes apparent at any stage of the proceedings that it lacks jurisdiction.[7] The party asserting jurisdiction has the burden of establishing subject matter jurisdiction.[8]

Standing is a jurisdictional issue that is properly challenged via a Rule 12(b)(1) motion.[9] Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'"[10] To show that the Court has jurisdiction over a case or controversy, a plaintiff must demonstrate that she has a personal stake—or standing—in the matter.[11] A plaintiff establishes standing by showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and

---

[4] Fed. R. Civ. P. 12(b)(1).

[5] *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1170 (10th Cir. 2023) (citations omitted).

[6] *Id.*

[7] *Siloam Springs Hotel, LLC v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

[8] *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

[9] *Colo. Env't Coal. v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004).

[10] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. CONST. art. III, § 2).

[11] *Id.*

(iii) that the injury would likely be redressed by judicial relief."[12] If a plaintiff fails to show that he has suffered an injury caused by the defendant and amenable to judicial remedy, there is no case or controversy and the Court has no jurisdiction over the matter.[13]

Generally, a Rule 12(b)(1) motion to dismiss takes one of two forms: a facial attack or a factual attack.[14] "In addressing a facial attack, the district court must accept the allegations in the complaint as true."[15] In a factual attack, the moving party does not attack the sufficiency of the complaint but asserts that the Court lacks subject matter jurisdiction based on facts outside of the pleadings.[16] In that instance, "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends."[17] When reviewing a factual attack, the Court "may not presume the truthfulness of the complaint's factual allegations."[18] Rather, the Court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)" without needing to convert the motion to summary judgment.[19]

**B.    Federal Rule of Evidence 702 and Motions to Exclude**

Rule 702 of the Federal Rules of Evidence governs the admissibility of opinion testimony from witnesses qualified as experts by their knowledge, skill, experience, training, or education.

---

[12] *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[13] *Id.* (citing *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

[14] *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995).

[15] *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

[16] *Holt*, 46 F.3d at 1003.

[17] *Id.*

[18] *Id.*

[19] *Id.*

Under Rule 702, expert opinion testimony is admissible to assist the trier-of-fact in matters of scientific, technical, or otherwise specialized knowledge provided that such testimony (1) is based upon sufficient facts or data, (2) is a product of reliable principles and methods, and (3) the witness applied the principles and methods reliably to the facts of the case.[20] As these requirements demonstrate, the court is charged as a gatekeeper to admit only expert testimony that is relevant and reliable.[21] This *Daubert* analysis considers the proffered expert testimony in a flexible inquiry specific to the facts of the case at bar.[22]

A *Daubert* analysis may be necessary when a plaintiff relies on expert opinions to certify a class under Federal Rule Civil Procedure 23 and demonstrate that Rule 23(a)'s requirements for numerosity, commonality, typicality, and adequacy are met.[23] But this need not be a full-fledged *Daubert* analysis because "as the parties remain engaged in merits discovery at the class certification stage, the information available to experts is limited."[24] Accordingly, "any *Daubert* analysis performed by the court will focus primarily on: (1) the knowledge, training, experience, and qualifications of the expert; and (2) the methodology relied on by the expert in formulating the challenged opinion."[25] In reviewing the latter, "[t]he focus . . . must be solely on principles and

---

[20] Fed. R. Evid. 702.

[21] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[22] *Id.* at 593; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (rejecting formulaic application of reliability factors discussed in *Daubert* because "[t]oo much depends upon the particular circumstances of the particular case at issue").

[23] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019 WL 1569294, at *3 (D. Kan. Apr. 11, 2019) ("If, for instance, a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for certification, a nearly full-fledged *Daubert* analysis may be appropriate.").

[24] *Id.* at *4.

[25] *Id.*; *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) ("We conclude that the district court did not err by conducting a focused *Daubert* analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.").

methodology, not on the conclusions that they generate."[26] Furthermore, any conclusion regarding expert testimony reached at this stage "is subject to amendment for purposes of the class certification determination and is not finally determinative of the admissibility of the expert's testimony at a trial on the merits."[27]

### III.    Analysis

**A.    Standing**

Union Pacific challenges the injury in fact and redressability elements of Plaintiff's purported standing. In doing so, Union Pacific asserts that its challenges are factual attacks. But a close look at Union Pacific's arguments reveals that they are facial rather than factual attacks. To start, Union Pacific does not offer any factual evidence to challenge Plaintiff's allegations. Next, regarding Union Pacific's challenge of Plaintiff's injury in fact, Union Pacific asserts that Plaintiff's injury is speculative, and therefore not sufficient to confer standing. And, as to the redressability argument, Union Pacific contends that Plaintiff's requested remedy does not correspond to her injury. These arguments do not contest the factual premises upon which Plaintiff's allegations rest. Rather, they presume Plaintiff's facts and challenge the sufficiency of the allegations to confer standing. Accordingly, the Court considers Union Pacific's arguments to be facial challenges and will accept Plaintiff's non-conclusory allegations in her Amended Complaint claims as true.[28]

---

[26] *Daubert*, 509 U.S. at 595.

[27] *In re EpiPen*, 2020 WL 1164869, at *3 (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).

[28] *See Rodriguez-Aguirre*, 364 F.3d at 1203. *Cf. Lujan*, 504 U.S. at 561 (standing is assessed by "the manner and degree of evidence required at the successive stages of the litigation"); *and Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009) ("[A]t the class certification stage a district court must generally accept the substantive, non-conclusory allegations of the complaint as true.").

*1.    Injury in Fact*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[29] In lodging its challenge to the injury in fact element of Plaintiff's standing, Union Pacific shifts focus away from the TCE contamination in the groundwater and towards the two risks that Plaintiff associates with the TCE contamination beneath the PCA homes. Union Pacific then describes Plaintiff's injury as a "risk of a risk" and insufficiently concrete.

The first risk identified by Union Pacific is the risk of TCE vapor intruding into Plaintiff's and the other PCA homeowners' homes. Because Plaintiff offers no testing to confirm her or any other PCA home actually contains TCE vapor attributable to Union Pacific's groundwater contamination, Union Pacific contends that the risk of vapor intrusion is not supported by any evidence. The second risk that Union Pacific points to is the risk of cancer and other health issues from exposure to TCE-contaminated vapors. Union Pacific posits that Plaintiff's allegations stack these risks upon each other, rendering the injury too speculative and attenuated from Union Pacific's alleged wrongful conduct to constitute a concrete injury.

But Union Pacific starts its argument halfway through Plaintiff's allegations, skipping over the nature of Plaintiff's claims. Plaintiff asserts that the TCE contamination beneath her home and the PCA homes is her injury in fact. Plaintiff has consistently maintained that she seeks redress for Union Pacific's violation of her *property* rights. She contends that the risks identified by Union Pacific go to show damages caused by the physical presence of TCE underneath the PCA homes.[30]

---

[29] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

[30] Plaintiff also contends that these risks—vapor intrusion and the associated health concerns—are additional injuries. Indeed, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). However,

Courts have found that both intangible and tangible injuries may satisfy the "concrete" requirement of the injury in fact inquiry.[31] Plaintiff styles the TCE contamination as an obvious "traditional tangible harm" that "has caused physical or monetary injury" amounting to a concrete injury.[32] Plaintiff maintains that the physical presence of TCE contamination in the groundwater and soil beneath her home is an "invasion of [her] legally protected [property] interest."[33]

This physical invasion is a concrete injury because it is "real" and not "abstract."[34] Just as "when one man placed his foot on another's property, the property owner needed to show nothing more to establish a traditional case or controversy,"[35] Plaintiff need not show anything more than the physical presence of the TCE beneath her home. Indeed, the physical presence of TCE underneath Plaintiff's home in the groundwater and soil is the type of harm recognized by each of her four remaining claims: negligent remediation (explicitly tied to the non-removal of TCE contamination); continuing nuisance, continuing trespass, and violation of Kansas's discharge statute.

When starting from the beginning of Plaintiff's allegations—namely at the assertion that the groundwater and soil beneath the PCA homes is contaminated with TCE from Union Pacific's Site—Plaintiff's four claims easily meet her burden of showing a concrete injury. Ironically, Union

---

because her primary argument—that the TCE contamination violates her property rights—constitutes an injury in fact sufficient to confer standing, the Court need not address this argument.

[31] *Id.* at 340.

[32] Doc. 220 at 5 (citing *TransUnion LLC*, 594 U.S. at 425).

[33] *Spokeo*, 578 U.S. at 339.

[34] *Id.* at 341.

[35] *Id.* at 344 (Thomas, J., concurring).

Pacific's next argument regarding redressability acknowledges that Plaintiff's claimed injury is the presence of TCE in the groundwater.

## 2. Redressability

Union Pacific asserts that the requested remedy—money to install vapor intrusion mitigation systems in the PCA homes—does not remedy the TCE contamination in the groundwater or soil. Because there is a mismatch between the requested remedy and the asserted harm, Union Pacific argues that Plaintiff fails to meet her burden to show that her injury is redressable. Plaintiff clarifies that she does not seek to enjoin Union Pacific to install vapor intrusion mitigation systems—rather she seeks money damages measured by the cost of installing vapor intrusion mitigation systems in the PCA homes.

Union Pacific cites *Steel Company v. Citizens for a Better Environment*[36] for the proposition that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[37] There, the plaintiff was an association of individuals interested in environmental protection, seeking to enforce a civil penalty against the defendant for failing to timely report details about its use of toxic chemicals as required by statute.[38] But the plaintiff sought the court to impose a civil penalty upon the defendant—payable to the United States Treasury—rather than any money damages payable to plaintiff.[39] Because the plaintiff would receive nothing but the gratification that the law was enforced, the Supreme Court found this "psychic satisfaction" insufficient to satisfy the redressability requirement.[40]

---

[36] 523 U.S. 83.

[37] *Id.* at 107.

[38] *Id.* at 86–87.

[39] *Id.* at 106.

[40] *Id.* at 107.

Plaintiff's request is easily distinguished from the plaintiff's request in *Steel Company*. She seeks damages payable to her and the class for the purpose of installing vapor intrusion mitigation systems. True, measuring those damages requires Plaintiff to prove that the risk of vapor intrusion and health effects are the result of Union Pacific's TCE contamination of the soil and groundwater. Nonetheless, at this stage of the proceedings and considering Plaintiff's allegations as true, they satisfy redressability because Plaintiff alleges that Union Pacific caused contamination and requests an award of money damages.[41] And even though Plaintiff's requested remedy does not fully remedy the TCE contamination in the groundwater and soil, it at least partially remedies the harm caused by her claimed injury.[42]

Plaintiff has sufficiently alleged that her property rights were violated when TCE  from Union Pacific's Site entered and remained upon Plaintiff's and the PCA properties. Union Pacific does not challenge the second element of the standing inquiry related to causation. And Plaintiff's request for money damages satisfies the redressability element. As such, the Court finds that Plaintiff has standing to bring her claims.

**B.**      **Motions to Exclude**

Union Pacific seeks to exclude all five of Plaintiff's experts from the Court's consideration of class certification. The Court will address Union Pacific's arguments with respect to each of Plaintiff's five experts.

---

[41] *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (holding that when "a defendant's action causes an injury . . . awarding damages for the action will typically redress that injury." (citation and internal quotation marks omitted)).

[42] *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (citation and internal quotation marks omitted)).

*1.    Dr. Laton*

Dr. Laton is an expert in hydrology, hydrogeology, environmental contamination, and site contamination investigations. Union Pacific does not challenge Dr. Laton's qualifications. Plaintiff relies on Dr. Laton to define the PCA by mapping the contours of the groundwater contamination plume at which TCE concentration is at or above 1.2 µg/L. Union Pacific challenges Dr. Laton's opinion on several grounds.

a.    Use of 1.2 µg/L

Union Pacific first argues that Dr. Laton's use of the number 1.2 µg/L as a threshold value is unreliable because it is based upon unverified assumptions. Union Pacific posits that Dr. Laton did not come up with the 1.2 µg/L number. In his report, Dr. Laton acknowledges that the significance of 1.2 µg/L groundwater contamination is tied to the risk of vapor intrusion. Plaintiff does not dispute that Dr. Laton did not independently arrive at the 1.2 µg/L value and agrees that Dr. Kram instructed Dr. Laton to use this as the threshold number to map the plume. An expert may permissibly "rely on the opinions of another expert if they inform or contribute to his own independent conclusions."[43] As more fully discussed in the discussion of Union Pacific's challenge to Dr. Kram, it cannot be said that this value lacks scientific support. Accordingly, Union Pacific's concerns with Dr. Laton's use of the value 1.2 µg/L to map the contamination plume goes to weight, not admissibility, and provides no basis to exclude Dr. Laton's opinion.[44]

---

[43] *Ash Grove Cement Co. v. Emps. Ins. Of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2007).

[44] *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) ("[A] district court must admit expert testimony as long as it is based on a reliable methodology. It is then for the jury to evaluate the reliability of the underlying data, assumption, and conclusion.").

b. Well-Depth and Other Potential Sources

Next, Union Pacific argues that Dr. Laton did not account for differentiating factors affecting testing samples. First, Union Pacific asserts that Dr. Laton did not account for the differences in the depth of well samples and the various soil types within the PCA. These variables—soil type and depth—affect the TCE in the groundwater's ability to reach the surface after volatizing. Dr. Laton explains in his report that contamination is subject to spatial variability—meaning the depth of the contamination may change with seasonal and other factors affecting the groundwater level. This is a concept acknowledged by one of Union Pacific's consultants.[45] To account for this vertical variability, Dr. Laton used test samples irrespective of the well-depth to capture the full extent of the plume.[46] Union Pacific also argues that Dr. Laton did not sufficiently account for other potential sources of TCE—specifically, dry cleaners and a nearby industrial corridor. But both of these arguments—that the depth of the contamination affects the risk of vapor intrusion and that there may be other sources of contamination—go more to the causation element of Plaintiff's claims rather than to issues related to class certification. As such, this is not a basis to exclude Dr. Laton's opinion from the Court's consideration of the certification issue.

c. Concerns Addressed by Dr. Laton's New Map

Union Pacific presented two arguments against Dr. Laton's map that the Court addressed in detail at the hearing: Dr. Laton's use of "historic maximums" and his inclusion of "non-detect" test results in his plume map. After the hearing, Dr. Laton significantly revised his plume map in

---

[45] *See* Doc. 187-2 (quoting Arcadis, one of Union Pacific's consultants, as stating "TCE observed in the shallow monitoring wells in the southern three-fourths of the plume is not likely to have migrated directly from the source zone. Instead, the shallow zones were likely cross-contaminated by diffusion from the lower zone or by upward smearing of contamination when groundwater elevations rose during natural fluctuations of recharge.").

[46] Doc. 187-8 at 33–34.

response to the Court's expressed concern and Union Pacific's arguments.[47] Nevertheless, because other experts relied upon Dr. Laton's original plume map to form their opinions, the Court will address all of Union Pacific's arguments in its motion to exclude Dr. Laton.

i.    Historic Maximums

To map the contamination plume, Dr. Laton reviewed and relied upon groundwater sampling tests from dozens of monitoring wells and one-time grab samples in and around the expected plume area. These samples have been taken at various times since 1991. In his initial map, Dr. Laton considered the "historic maximum" from each well, meaning Dr. Laton took the highest value of TCE concentration reported over this more than 30-year testing period for any given well or sample. For example, in 2005, one monitoring well reported TCE contamination at a value of 5.9 µg/L; however, samples from that same well taken between 2010 and 2023 detected no TCE. But because the 5.9 µg/L value was the "historic maximum" from this monitoring well, Dr. Laton used this number rather than the more recent test data.

Union Pacific asserts that a map of the plume using this method does not reflect the current plume but rather creates a "phantom plume." This phantom plume masks the impact of remedial measures taken by Union Pacific over the years. Plaintiff responds that Dr. Laton's method is consistent with the practice of hydrogeologic plume mapping and EPA guidance. Dr. Laton justifies the use of historic data by pointing out that groundwater systems are dynamic, and that fluctuations make it possible for a well sample to not detect TCE one day and for that same well to subsequently return a positive test for TCE. When asked about the source of this method during his deposition, however, Dr. Laton could cite no authority for using the historic maximum.[48]

---

[47] Doc. 217.

[48] Doc. 196-1 at 88–89.

Rather, he merely stated that he has seen it employed and has used it before, but could not provide specific authority for this proposition.[49] Aside from another case in which Dr. Laton's use of this historical maximum approach was found to be "arguably" accepted in his field, Plaintiff provides no other evidence that this is an accepted method.[50] The Court considers this to be an *ipse dixit*—nothing more than Dr. Laton's statement that this is a legitimate method of mapping a contamination plume.[51]

The Court's concern with Dr. Laton's use of historic maximums is enhanced by the specific facts here. It is undisputed that Union Pacific, at the direction of KDHE, has been engaged in significant remediation activities at the Site since at least 2005. It defies logic to use test samples that predate that remediation activity by 14 years to map the *current* groundwater plume. This concern becomes even more pronounced considering one of Plaintiff's claims is that Union Pacific has been negligent in remediating the contamination. To map the area in which Plaintiff alleges that Union Pacific has been negligent in remediating by plotting the value of tests predating Union Pacific's remedial efforts is temporally and logically irreconcilable. As such, the Court expressed significant concern with the reliability of Dr. Laton's use of historic maximum levels of TCE contamination over the last 30 years.

---

[49] *Id.*

[50] *See Behar v. Northrop Grumman Corp.*, 2026 WL 413398, at *5 (C.D. Cal. Feb. 4, 2026) ("The use of 'historical maximum concentrations' is (arguably) an accepted method in Dr. Laton's field as a conservative technique to capture all possible exposure."). Although the Central District of California Court accepted this argument, a review of the plaintiffs' memorandum in opposition to the exclusion of Dr. Laton in that case reveals that plaintiffs only cited Dr. Laton himself for the proposition that historical maximum concentrations are accepted in the hydrogeology field and did not cite any other authority. *See* Pls.' Opposition to Defs.' Northrop Grumman Corp.'s Notice of Mot. & Mot. to Exclude the Ops. of Pls.' Expert Dr. Richard Laton, *Behar v. Northrop Grumman Corp.*, 2026 WL 413398 (C.D. Cal. Feb. 4, 2026), 2025 WL 3676893.

[51] *Ipse dixit* translates as "he himself said it" and is defined as "[s]omething asserted but not proved." *Ipse Dixit*, Black's Law Dictionary (12th ed. 2024).

Plaintiff subsequently filed a map revised by Dr. Laton that only takes account of the maximum value of well samples since 2023. This significant revision allays the Court's concern with the reliability of Dr. Laton's map.

### ii.    Non-Detects

Before addressing Dr. Laton's use of "non-detect" values, the concept of a "non-detect" warrants a brief description. Due to instrument and resource limitations, any test for particles in a sample has a detection limit. A detection limit is the smallest quantity of particles for which a given test can confidently provide a reading. A "non-detect" is a test result that is lower than the detection limit for the given test. For example, if a test has a detection limit of 5 µg/L, that test's results can only state with confidence a reading of 5 µg/L or greater. A result of 4.99 µg/L or lower would be considered a "non-detect" because it falls below the test's detection limit. Some tests have high detection limits, and some tests have low detection limits.

In his initial plume map, when Dr. Laton came across a "non-detect," he assigned a value of half the detection limit to that reading. He then incorporated this substituted value—half the test's detection limit—into his plume map. For example, if a test had a detection limit of 5 µg/L and the sample returned a "non-detect," Dr. Laton considered that the sample would have reported 2.5 µg/L. He then incorporated the substituted value of 2.5 µg/L into his plume map.

Plaintiff does not dispute that Dr. Laton employed this method. Instead, Plaintiff contends that this is a standard, conservative use of non-detect values and that it is a method commonly used by hydrogeologists. Plaintiff cites the EPA's 2009 *Statistical Analysis of Groundwater Monitoring Data at RCRA Facilities: Unified Guidance* ("Unified Guidance") for this proposition.[52] A review

---

[52] ENVTL. PROT. AGENCY, STATISTICAL ANALYSIS OF GROUNDWATER MONITORING DATA AT RCRA FACILITIES: UNIFIED GUIDANCE (2009).

of the Unified Guidance confirms that this method is called simple substitution and that it is a statistically appropriate manner of handling non-detects in certain circumstances.[53] But it also reveals that the circumstances under which the Unified Guidance suggests non-detect readings should be substituted with a numerical value are not present here.

The Unified Guidance identifies three scenarios in which simple substitution should be used to handle non-detects. The first circumstance in which simple substitution is appropriate is "[w]hen the sample size is too small to do anything else."[54] This is when there are only a handful of samples to analyze.[55] Here, the first circumstance is not present because there are over 30 years of testing samples from dozens of wells. The second circumstance is "[w]hen non-detects comprise no more than 10–15% of the total sample."[56] It is not clear what the ratio of non-detect samples to confident readings were, but a review of the map in which Dr. Laton identifies which samples had non-detect values shows that there are almost certainly more than 10–15% non-detects when compared to the total sample size.[57] Thus, the second circumstance is not present either. The third circumstance is "[w]hen non-detects are generated by a different physical process than the detected values, and thus represent a distinct statistical distribution."[58] This is most often used by assigning a zero value to the non-detect sample.[59] The third circumstance is not present here because Dr.

---

[53] *Id.* at 15-3.

[54] *Id.* at 15-5.

[55] *Id.*

[56] *Id.*

[57] *See* Doc. 187-8 at 68.

[58] UNIFIED GUIDANCE at 15-6.

[59] *Id.*

Laton did not do this in his initial map, rather he attached a substituted positive value for the non-detects rather than a zero.

In all other cases, the Unified Guidance recommends complicated mathematical formulas to handle non-detect values.[60] Because the circumstances in which the Unified Guidance would recommend using simple substitution are not present here, the Court indicated that it had grave concerns over Dr. Laton's simple substitution of half the detection limit for non-detect test results in his plume map. But Dr. Laton's new map assigns a value of zero to non-detect testing samples. This significant revision allays the Court's concerns with Dr. Laton's map.[61]

Because Dr. Laton's revised map addresses the Court's reliability concerns and the Court has found Union Pacific's other arguments to exclude Dr. Laton unpersuasive, Dr. Laton's testimony and opinions will not be excluded from the Court's consideration of the class certification issue.[62]

### 2. Dr. Kram

Dr. Kram is a hydrogeochemist. He holds a Ph.D. in Environmental Science and a master's degree in Geology. He has over 40 years of experience assessing groundwater contamination, subsurface vapor migration, and vapor intrusion. Union Pacific does not challenge Dr. Kram's qualifications. Dr. Kram opines that the TCE groundwater plume originating from the Site is widespread and extends beneath thousands of residential properties in the PCA. Dr. Kram further

---

[60] *See id.* at 15-3–15-24.

[61] Union Pacific's Response to Dr. Laton's new map takes issue with Dr. Laton's continued incorporation of non-detect well samples. However, Dr. Laton assigns a zero value to the non-detect well samples which is an appropriate method of handling non-detect samples and explicitly contemplated by the Unified Guidance. UNIFIED GUIDANCE at 15-6.

[62] Union Pacific expressed concern over the fact that it did not receive some of the parameters supporting Dr. Laton's new map, rendering his new map method untestable. Plaintiff responds that Dr. Laton's new map employed a simple linear interpolation method rather than the complicated methods Union Pacific suggests. As such, Union Pacific's argument here is no basis to exclude Dr. Laton's new map.

opines that Union Pacific's investigation and remediation efforts have not adequately addressed vapor intrusion risk. Finally, he offers that the time and resource limitations required to test each home in the PCA outweigh the cost of implementing preemptive mitigation measures in each home. Dr. Kram's opinions go to commonality, typicality, and predominance as they establish a common risk of harm.

Union Pacific lodges three overarching challenges to Dr. Kram's opinion. First, Union Pacific contends that Dr. Kram uses the wrong standard when he relies on EPA screening levels. Second, Union Pacific asserts that Dr. Kram's recommendation that preemptive mitigation is required is inconsistent with the applicable standards. Finally, Union Pacific takes issue with Dr. Kram's estimation of the cost of vapor intrusion mitigation.

### a.   Use of EPA Screening Levels

Dr. Kram opines that every property overlying the 1.2 µg/L isoconcentration contour is "more likely than not threatened by toxic chemicals via the vapor intrusion pathway and has been for decades."[63] Dr. Kram relies upon the *OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air* ("OSWER").[64] He does a back-calculation using the EPA's TCE contamination indoor-air risk screening value of 0.48 µg/m$^3$ and the EPA's default groundwater-to-indoor air attenuation factor (which accounts for the diminishing concentration of TCE as it moves from the groundwater, through the soil and other barriers, and into the indoor air of a home overlying that contaminated groundwater). Using these numbers, Dr. Kram back-calculates that when the TCE value in groundwater is at or exceeds

---

[63] Doc. 199-1 at 68.

[64] OFFICE OF SOLID WASTE AND EMERGENCY RESPONSE, ENVTL. PROT. AGENCY, OSWER TECHNICAL GUIDE FOR ASSESSING AND MITIGATING THE VAPOR INTRUSION PATHWAY FROM SUBSURFACE VAPOR SOURCES TO INDOOR AIR (2015) [hereinafter OSWER].

1.2 µg/L, one can expect that an overlying home will have a TCE concentration of $0.48 µg/m^3$ in the indoor air.

Union Pacific seeks exclusion of this opinion for several reasons: (1) the $0.48 µg/m^3$ value is based upon EPA guidance and is lower than what KDHE has used; (2) the $0.48 µg/m^3$ value only represents a "screening" level rather than an "action" level; (3) Dr. Kram relies upon Dr. Laton's map without verifying Dr. Laton's methodology; and (4) Dr. Kram failed to account for variability in individual homes. The Court will address each argument in turn.

First, Union Pacific argues that because KDHE is overseeing the remediation of the Site, Dr. Kram should have used KDHE's risk screening levels instead of the EPA's. Union Pacific and KDHE have been using the indoor-air risk screening level of $2.09 µg/m^3$ rather than the EPA's lower value of $0.48 µg/m^3$. Plaintiff responds that KDHE standards are not dispositive of the issues between private parties and are not to be used as the standard for due care. *Daubert* does not require the Court to resolve which of two competing standards are better suited for use. Rather, the Court must evaluate whether an opinion is based upon reliable principles. Union Pacific does not contend that the EPA's screening levels are scientifically invalid—merely that KDHE's standards are better suited to assess Union Pacific's culpability. This is not a serious challenge to Dr. Kram's methodology, rather it is a demand that Dr. Kram use Union Pacific's preferred data and methods. As such, it is no reason to exclude Dr. Kram's opinion.

Second, Union Pacific points out that the EPA guidance Dr. Kram relies upon is a "screening" level that recommends more testing, rather than an "action" level that would warrant implementing mitigation measures. Union Pacific flags Dr. Kram's opinion that mitigation measures be implemented as inconsistent with the EPA guidance he cites. But Dr. Kram arrives at this conclusion after considering that it would be more cost effective to implement mitigation

measures at all homes *now* rather than to engage in a lengthy testing process. Contrary to what Union Pacific contends—that Dr. Kram skipped the "testing" step and jumped straight to recommending mitigation—Dr. Kram considered the cost of testing and concluded that it would be more economically feasible to mitigate. As such, Dr. Kram's opinion does not suffer from the analytical gap that Union Pacific perceives.[65]

Third, Union Pacific argues that Dr. Kram relies on the flawed mapping work of Dr. Laton and his reliance is misplaced because he did not understand Dr. Laton's methods. Plaintiff does not dispute that Dr. Kram relied upon Dr. Laton's initial map to arrive at this conclusion. In a deposition, Dr. Kram stated that he did not read Dr. Laton's report and was unaware of Dr. Laton's methodologies. This is concerning because "one expert may not rely on another expert's opinion if the first expert is unfamiliar with the methods and reasons supporting the second."[66] Plaintiff responds that this is of no concern because Dr. Kram is not disclosed to testify to the location of the plume itself (where the groundwater exceeds 1.2 µg/L). But Dr. Kram provides an opinion that "*every* occupied residential building on these 2,319 parcels"—identified by Dr. Laton's initial plume map—is a candidate for preemptive mitigation.[67] Dr. Kram's identification of a definite number of homes in the PCA, indicates that he *does* opine as to the location of the groundwater plume. Accordingly, to the extent Dr. Kram identifies a definite number of homes currently at risk for vapor intrusion, this opinion is excluded because he impermissibly relied upon Dr. Laton's initial map without verifying the report and because Dr. Laton's initial map was problematic.[68]

---

[65] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data").

[66] *Assessment Techs. Inst., LLC v. Parkes*, 2021 WL 2530977, at * (D. Kan. Jun. 21, 2021) (citation omitted).

[67] Doc. 199-1 at 42 (emphasis added).

[68] This is distinct from Dr. Kram's opinion regarding the effect 1.2 µg/L groundwater contamination has on an overlying home, generally.

Fourth, Union Pacific asserts that Dr. Kram failed to account for the individual characteristics in individual PCA homes affecting TCE's pathway from groundwater to vapor intrusion. Union Pacific cites several lines of Dr. Kram's deposition testimony in which he acknowledges that variables in individual homes, like HVAC or plumbing systems, should be taken account. Union Pacific seems to assert that Dr. Kram's recognition of individual characteristics in homes affecting vapor intrusion is inconsistent with his broader opinion that all homes overlying the 1.2 µg/L TCE groundwater contamination are at risk for vapor intrusion. But it is clear from the cited portions of the deposition that Dr. Kram merely acknowledges that the referenced variables affect the cost of mitigation—not the *risk* of vapor intrusion.[69] As such, Union Pacific's argument here is unpersuasive.

b.   Preemptive Mitigation

Union Pacific argues that Dr. Kram's opinion that preemptive mitigation is required is unreliable because (1) it is inconsistent with the level of risk and the guidance he cites; and (2) it relies upon baseless estimates for costs of further testing. Neither basis warrants excluding Dr. Kram's opinion on preemptive mitigation.

Union Pacific argues that Dr. Kram's preemptive mitigation recommendation is not supported by the OSWER guidance he cites. Plaintiff, however, cites a scenario from the OSWER guidance that contemplates offering preemptive mitigation instead of testing.[70] Accordingly, Union Pacific's argument that Dr. Kram's opinion is inconsistent with this guidance is unpersuasive. Union Pacific's other points rehash arguments previously presented drawing a distinction between EPA screening and action levels and insisting upon the use of KDHE

---

[69] Doc. 199-2 at 108–09.

[70] OSWER at 138 ("[I]t may be determined to use a [preemptive mitigation] approach to offer mitigation systems to all buildings within a specified area of subsurface contamination.").

standards. For the same reasons discussed above, these arguments do not warrant excluding Dr. Kram's testimony.

Union Pacific's second argument—that Dr. Kram's mitigation opinion relies upon baseless estimates—is also unpersuasive. Dr. Kram's opinion relies upon a comparison between the cost of determining the reasonable maximum exposure ("RME") for each home against the cost of preemptive mitigation measures. According to Dr. Kram and the OSWER guidance he cites, accurately determining the RME is a lengthy and costly process because testing must account for spatial and temporal factors affecting indoor air concentration of TCE in a given home.[71] From this Dr. Kram concludes that preemptive mitigation is more cost effective. Union Pacific asserts that calculating the RME using Dr. Kram's method is not the exclusive method of conducting indoor air testing. Once again, however, although Union Pacific would prefer Dr. Kram use another standard, it cannot be said the Dr. Kram's opinion lacks scientific validity. As such, this is no basis to exclude Dr. Kram's opinion.

c.   Dr. Kram's Cost Estimate for Vapor Intrusion Mitigation

Lastly, Union Pacific argues that Dr. Kram's estimate of mitigation costs is unreliable because it is based upon insufficient facts and data. Plaintiff responds that she does not rely upon Dr. Kram's estimate of damages for class certification. Because Dr. Kram's opinion here is not relevant to class certification, the Court will not conduct a *Daubert* analysis of this particular issue.[72]

---

[71] *Id.* at 88 ("Several rounds of sampling are recommended to develop an understanding of temporal variability to ensure that final risk management decisions are based upon a consideration of a reasonable maximum vapor intrusion condition.").

[72] *In re EpiPen*, 2019 WL 1569294, at *4 ("A district court, thus, should apply 'a focused *Daubert* analysis which scrutinize[s] the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.'"(quoting *In re Zurn*, 644 F.3d at 614)).

3.      *Mr. Anastasi*

Mr. Anastasi is a hydrogeologist with more than 40 years of experience studying and working on projects to remediate soil, groundwater, and sediment contamination at industrial facilities. Union Pacific does not challenge Mr. Anastasi's qualifications. Mr. Anastasi's opinions relate to the location of the plume (going to commonality, typicality, and predominance) and Union Pacific's negligent remediation efforts (going to Plaintiff's negligent remediation claim). Union Pacific presents two challenges to Mr. Anastasi's opinions: (1) that he does not provide an opinion independent of Dr. Laton's and (2) his opinion regarding Union Pacific's remediation measures is irrelevant.

a.    Mr. Anastasi's Reliance upon Dr. Laton

Mr. Anastasi reviewed and relied upon Dr. Laton's initial map to arrive at his opinions. From his review, Mr. Anastasi offers that "it is more likely than not, accounting for the dynamics of the plume, that TCE contaminated ground water is present beneath the entire area encompassed by [Dr. Laton's] 1.2 ug/L TCE contour."[73] Union Pacific challenges Mr. Anastasi's opinion as not an independent opinion, but merely a repackaged version of Dr. Laton's initial map. Plaintiff responds that Mr. Anastasi did not rely solely on Dr. Laton's map, but that he also reviewed historical site reports, data from the investigation of the Site, and the subsurface hydrogeology and geology. Plaintiff contends that Mr. Anastasi then compared that data to Dr. Laton's map to form his opinion that every home in the plume identified by Dr. Laton sits above a 1.2 µg/L TCE groundwater contamination.

The Court agrees that, at root, Mr. Anastasi's opinion is a tautology of Dr. Laton's report. But as discussed above, Dr. Laton's initial map presented issues that caused the Court concern—

---

[73] Doc. 198-1 at 15.

so much so that Dr. Laton significantly revised his map of the plume. And although Mr. Anastasi may have reviewed other data, he does not provide an independent plume map. Rather, his opinion is contingent upon the contours that Dr. Laton assigned to the plume in his initial map. As such, Mr. Anastasi's opinion is inextricably tied to issues that the Court found to be problematic and to a map that has since been revised. The Court must find that Mr. Anastasi's opinion is irrelevant at best and exclude Mr. Anastasi's first opinion regarding the PCA from its consideration of the class certification issue.

> b.   Mr. Anastasi's Negligent Remediation Opinion

Union Pacific asserts that Mr. Anastasi's second opinion regarding Union Pacific's remediation efforts is irrelevant to class certification. Mr. Anastasi opines that the remedial actions undertaken by Union Pacific have been, and continue to be, inadequate to remediate the TCE in the groundwater underneath the PCA. Plaintiff responds that Mr. Anastasi's opinion regarding the remediation goes to liability and supports the predominance and commonality elements of the class certification question. Further, Plaintiff contends that Mr. Anastasi's opinion establishes that Union Pacific engaged in a common course of conduct applicable to all potential class members. Union Pacific presents no other ground to exclude Mr. Anastasi's opinion. Of significant note, one of Plaintiff's claims for which she seeks class certification is negligent remediation—a matter directly addressed by Mr. Anastasi's second opinion. Accordingly, the Court finds that Mr. Anastasi's opinion regarding Union Pacific's remediation efforts is relevant to the commonality and predominance elements of class certification and will consider it at this stage.

> 4.   *Mr. Hatton*

Mr. Hatton is one of the nation's foremost experts in designing and installing mitigation systems in homes and commercial spaces to reduce vapor intrusion from manufacturing chemicals

or naturally occurring radon. Union Pacific does not challenge Mr. Hatton's qualifications. Mr. Hatton opines that there are two categories of homes within the PCA, and he provides cost estimates to install vapor intrusion mitigation systems in both types of homes. Mr. Hatton's opinions go to commonality, typicality, and predominance as he provides an estimate of the cost of mitigation measures. Union Pacific presents two main arguments against Mr. Hatton's opinions. First, Union Pacific asserts that Mr. Hatton's opinion that Plaintiff's property is representative of other residential properties is based upon insufficient facts and data. Second, Union Pacific argues that Mr. Hatton did not follow a recognized methodology to estimate the costs of mitigation systems.

    a.    Types of Homes in the PCA

Mr. Hatton opines that there are two types of houses within the PCA: single-family single-story ranch homes and single-family two-story residences. Union Pacific challenges this opinion by asserting that (1) Mr. Hatton only did a drive-through observation of less than half the homes within the PCA, and (2) Mr. Hatton did not review property tax records even though he stated he did so in his report. The Court will address each argument in turn.

Union Pacific argues that Mr. Hatton's investigation of the types of homes in the class area was insufficient because he only entered two homes and otherwise merely drove around the PCA. Union Pacific points out that Mr. Hatton did not do a close inspection of the vast majority of the PCA homes. To formulate his estimate for the cost of installing mitigation systems, however, the most pertinent factor distinguishing these homes is whether the home has a crawlspace or a basement.[74] Mr. Hatton accounts for any other individual characteristics by allowing for a margin

---

[74] Doc. 197-1, at 4.

of error in his estimates of between 4–5%. Here, Union Pacific is aware of the nature of Mr. Hatton's investigation and can effectively cross-examine him on this matter. [75]

Union Pacific next argues that Mr. Hatton's opinion is unreliable because his report indicates that he reviewed government records, but Union Pacific asserts that Mr. Hatton testified in a deposition that he did not review these records. A review of the deposition transcript indicates that Mr. Hatton testified that one of his team members assisting in writing the report likely reviewed the records. [76] The Court finds that this perceived inconsistency is a matter more appropriately handled on cross-examination.

### b. Mr. Hatton's Mitigation Cost Estimates

Mr. Hatton provides estimates for the cost of designing, installing, operating, and maintaining mitigation systems in the two types of homes within the PCA. He estimates that the cost of diagnosing and designing mitigation systems will range between $7,900 and $9,100. He estimates that installing the mitigation systems will range between $21,000 and $28,000. Finally, he estimates that operations, maintenance, and monitoring costs will be between $8,100 to $8,900 for the first year and between $2,000 and $2,300 annually after that. Union Pacific presents three arguments for excluding these estimates. First, Mr. Hatton did not follow his own detailed methodology for estimating mitigation costs. Second, Mr. Hatton's estimates are based upon unsupported assumptions and data. Third, Mr. Hatton acknowledges that his estimates will not be consistent with the actual remediation costs. The Court will address each in turn.

---

[75] *White Oak Glob. Advisors LLC v. Weder*, 2020 WL 8677761, at *3 (W.D. Okla. Apr. 10, 2020) ("Where an expert witness offers testimony based upon incomplete information, his testimony is nevertheless admissible if the inadequacies are known to the defendant in order to thoroughly cross-examine the witness." (internal quotations marks and citations omitted)).

[76] Doc. 197-2 at 124–25.

Union Pacific asserts that Mr. Hatton agrees that mitigation systems require detailed, property-specific methodology to diagnose, design, and implement. To generate his estimates, however, Mr. Hatton did not conduct the detailed analysis required to arrive at a reliable estimate. Union Pacific argues that Mr. Hatton's estimation is inherently unreliable for this reason. Plaintiff responds that Union Pacific misunderstands Mr. Hatton's opinion. Mr. Hatton agrees that the detailed assessment must be done, however, it does not need to be done yet. According to Plaintiff, Mr. Hatton's estimate bakes in the detailed design phase of the mitigation systems and that his 4–5% margin of error accounts for differences in construction and design. A review of Mr. Hatton's report indicates that his estimates account for a "diagnose" and "design" phase accounting for between $7,900 and $9,100. As such, Union Pacific's argument that Mr. Hatton did not follow his own methodology by accounting for a detailed diagnose and design phase is unpersuasive.

Next, Union Pacific argues that Mr. Hatton's cost estimates are based upon unsupported assumptions and data that is not provided in his expert report. Union Pacific asserts that Mr. Hatton relied upon cost estimates supplied by a colleague, and that Mr. Hatton did not retain his colleague's source cost estimates. Plaintiff responds, and Union Pacific does not dispute, that it did not file a discovery motion for this material and elected not to depose Mr. Hatton's colleague. Union Pacific's argument here is a discovery concern disguised as a *Daubert* challenge. As such, the Court declines to entertain this argument.

Finally, Union Pacific argues that Mr. Hatton admits that actual costs will not be consistent with his estimates. This argument repeats Union Pacific's initial concern that Mr. Hatton did not account for individual characteristics in PCA homes. As discussed above, however, Mr. Hatton provided that his estimates may vary by 4–5%. Any further concerns Union Pacific may have may be explored on cross-examination.

In sum, none of Union Pacific's arguments for excluding Mr. Hatton are persuasive, and the Court declines to exclude Mr. Hatton's testimony from its consideration of whether a class should be certified.

### 5. Dr. Zabel

Dr. Zabel is an urban and real estate economist. Dr. Zabel was retained to estimate the property values of the PCA homes to rebut any claim that mitigation costs exceed the value of the PCA properties. During the hearing, the parties agreed that Dr. Zabel's proffered rebuttal testimony is not relevant to the issue of class certification. Because Union Pacific's motion to exclude Dr. Zabel's testimony is tied to the issue of class certification, and the parties agree that Dr. Zabel is not relevant for that purpose, the Court will not consider his opinion for class certification purposes.

### 6. Motions to Exclude Summary

For the purposes of determining class certification the Court will consider Dr. Laton's revised map; Dr. Kram's opinion, except as to the area of the PCA; Dr. Anastasi's opinion regarding Union Pacific's negligence in remediating the contamination; and Mr. Hatton's opinions. The Court will not consider Dr. Zabel's opinions for class certification.

**IT IS THEREFORE ORDERED** that the Union Pacific's Motion to Dismiss (Doc. 218) is **DENIED**.

**IT IS FURTHER ORDERED** that the Union Pacific's Motion to Exclude Plaintiff's Experts (Doc. 185) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED**.

Dated this 4th day of June 2026.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE